## UNITED STATES v. MULLONEY et al.
### No. 12395.

District Court, D. Massachusetts.
Oct. 1, 1934.

See, also, 5 F. Supp. 77.

Francis J. W. Ford, U. S. Atty., of Boston, Mass., and Irving G. McCann and Hugh J. Lavery, Sp. Assts. Atty. Gen., for the United States.

Franklin R. Chesley, Marvin C. Taylor, and Phipps, Durgin & Cook, all of Boston, Mass., for defendant Mulloney.

James W. Sullivan, of Lynn, Mass., and Charles J. Dunn and Timothy F. Callahan, both of Boston, Mass., for defendant Deery.

MORTON, Circuit Judge.

I will deal first with facts, and then with the law, and then state my conclusions. The facts are for the most part not in serious controversy. On the 29th of September, 1931, when the loan on the Ganley note was made by the Federal National Bank, the defendant Mulloney was president of that bank and exercised general control of its affairs. Though the voting trust gave him control over the election of officers by the shareholders, the directors as a board were not his creatures.

The defendant Deery was president of the Salem Trust Company and also of the Salem Realty Company. The Salem Trust Company was not owned by the Federal National Bank but was closely affiliated with it. The Realty Company was a substantial concern owning and operating real estate properties.

Mulloney and Deery each owned one-third of the stock of the Federal National Company, a corporation of substantial size engaged in the purchase and sale of securities. In a business way the two men were closely associated.

Mulloney testified that the Federal National Bank was at that time in a strong cash position. It appears to have been so regarded by the comptroller and to have been in a position to lend $131,000 on proper security at the time when the loan in question was made. Indeed there is no suggestion to the contrary. Morrissey was vice president of the Federal National Bank and treasurer of the Federal National Company acting under the immediate direction of Mulloney. In the summer of 1931, the Federal National Company had desired to borrow $70,000 from the Salem Trust Company and its note for that amount had been made and sent to the Salem Company in the expectation that the loan would go through. Deery held it up and the note was returned. The matter appears to have been in abeyance at the time in question.

Some time before September 29, 1931, Deery told Mulloney that he contemplated purchasing for the Salem Realty Company the Colonial Theatre property in Haverhill and desired a loan in connection with it. Mulloney testified that he knew the property; that Deery told him what he was going to pay for it and showed him a statement of the rentals including a long-term lease to Olympia Theatres, Inc., which had been agreed upon. Deery told Mulloney that he desired a loan of $131,000 on a note signed by his secretary, Miss Ganley. The details of the transaction were discussed between the two, and at Mulloney's suggestion it was agreed that $625 per month should be paid on the principal in addition to the payments of interest. This agreement does not appear in the note, which is a demand note for $131,000 on a collateral form secured by the second mortgage which will be more fully referred to. Mulloney said he would present the matter to his directors and did so at the meeting on September 24, 1931. He made no examination of the property and had no appraisal of it; nor does he appear to have had any special report or investigation of the financial standing of the Olympia Compa-

ny. He testified that he had a very high opinion of the Paramount Publix Company and of its subsidiary the Olympia Company and approved the loan principally because of the long-term lease to the Olympia Company. In presenting the matter to the directors, he did not undertake to describe the property but he stated the rentals and handed around the Olympia lease.

This lease was for twenty-four years at an annual rental of $17,500 in cash and other considerations of more speculative value. The Olympia Theatres, Inc., at that time showed on its statements of condition a net worth of about $11,000,000; it was a going and apparently successful company.

Mulloney testified that he said to the directors of the Federal National Bank that, "It would be a slow loan but he thought a good one, that Miss Ganley was Deery's secretary and was financially of no account." The directors assented without any formal vote; it appears not to have been their practice to take formal votes on such questions. Two of them signed the page of the loan book on which the loan was entered. On Mulloney's testimony he and the directors all understood that the Ganley note had nothing behind it but the collateral security on which it was made.

The collateral which secured the Ganley note consisted only of a second mortgage on the Colonial Theatre property on which the amount then due was $131,000. This mortgage had been taken by the Coulson and Bicknell estates, or by their testators in connection with a sale of this property by them to one Kyriax several years before. It was subject to a prior mortgage to a Haverhill Savings Bank for $105,000. The two estates indorsed without recourse the notes secured by the second mortgage and assigned the mortgage and delivered the notes to Miss Ganley who in turn passed them on to the Federal National Bank with the note in question. As part of the same transaction, the equity in the property was conveyed for the estates to the Salem Realty Company. The Salem Realty Company made the lease to the Olympia Theatres, Inc., above referred to and in the lease guaranteed to the Olympia Company the payment to the two mortgages. This guaranty gave added value to the lease. The lease was never assigned to the Federal National Bank, nor did the Realty Company or the Olympia Company enter into any undertakings to the bank to pay the Ganley loan; but the lease being subject to the second mortgage, of course, strengthened the latter. Deery paid the Coulson and Bicknell estates

for the second mortgage and the equity in the property $25,000 in cash and $25,000 par value of certain bonds of the Federal National Investment Trust which the comptroller had said were not worth par, a total of less than $50,000, that is, about one-third the amount of the loan made upon it as collateral.

The defendants insist that the price at which the second mortgage and equity were sold was no criterion of their value, that Deery made an exceedingly fortunate purchase. It appears that beginning July 1, 1931, the rent of the theater was increased from $9,000 to $17,500, and it is said that the sale by the two estates, arranged before this increase and on the basis of the old rental, by no means correctly represented the value of the property under the new long-term lease. The Olympia Company and the realty company had certain directors in common, and the increased amount of rent to some extent perhaps reflects other considerations than real market values. Also it was made in connection with the tie-up of the Colonial Theatre with another Haverhill theatre under the Haverhill Operating Company, a subsidiary of the Olympia Company, the operating company agreeing to pay the Olympia a rent of $20,000 per year for the Colonial, for which the Olympia Company was paying $17,500. It does not appear that Mulloney knew this though Deery did; the only bearing of the matter is that such large and rapid increases of rent made under such circumstances suggest certain doubts as to their soundness and permanence.

Certain real estate experts called by the defendants testified that in their opinion the Colonial property with the lease was worth more than $340,000. Other experts called by the defendants, Mr. Felton and Mr. Murphy, valued the property at about $100,000 less, Mr. Felton's figures being made on a statement of rents which were not fully realized and perhaps being subject to reduction on that account. An expert called by the government testified that in his opinion the property was worth at this time $150,000 to $160,000. The president of the savings bank which held the first mortgage, called by the defendants, testified that their board of investment valued the property at $230,000 in 1928 and $150,000 in 1933, which was after the new lease. The assessed value of the property was, as stated by Mr. Murphy, about $175,000.

Aside from the new lease, the property does not seem to have been worth much above the amount for which Deery bought it from

the two estates, that is, about $150,000. How much the new lease added to the value is difficult to determine. Long-term leases to responsible tenants may have great value. Of course, whatever is paid for such a lease must be amortized during the term of it, and such leases of business properties carry certain risks of fire and of failure which have to be considered in capitalizing their value. As has just been said, the savings bank which held the first mortgage decreased the value of the property between 1928 and 1933 by $80,000, notwithstanding the incidence of the new lease during that interval. According to Kyriax, the property did not pay its way under the old lease, and according to Miss Ganley, it did not do so the first year under the new lease.

There is no evidence that the second mortgage itself had a market value of $131,000 or could have been sold for that sum. Mr. Mulloney apparently did not think so for he stated to the directors that it was a slow loan which would eventually be liquidated from the rents or refunded, not contemplating I infer any possibility of immediate payment.

On the basic facts as above stated, supplemented by many secondary facts and significant bits of evidence which, of course, I have not attempted to state, the government contends that the charges are sustained.

■ Turning to the law of the case, the statute is a comparatively simple one, namely, that any officer of any member bank "who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of such * * * member bank, * * * or who makes any false entry in any book * * * of such * * * bank, with intent in any case to injure or defraud such * * * bank, * * * or to deceive any officer of such * * * bank, or the Comptroller of the Currency, or any agent or examiner * * * shall be deemed guilty of a misdemeanor." 12 USCA § 592. Under the first count there are two questions, (1) Was there a misapplication? and (2) Was it made with the intent to defraud or injure the bank? Both elements must, of course, be proved beyond reasonable doubt.

■ I am aware of no inclusive definition of what constitutes misapplication under this statute, which is the charge made in count 1. It is meant, I think, to cover an obviously improper and unjustifiable use of moneys, funds, or credits of a bank which is neither embezzlement nor abstraction, both of which are specially referred to, and which is likely to cause loss, and I, so rule. It does not cover transactions merely because they happen to be prohibited, for instance, loans to an individual beyond the permitted amount. To be within the statute, the transaction must therefore be obviously improper and unjustifiable when it was made, and there must be such probability of loss as to warrant finding beyond reasonable doubt that there was an intent to injure or defraud the bank. Of course, a banker is not subject to conviction under this statute merely because he used bad judgment in making the loan.

■ On the first point, taking Mr. Mulloney's own statement of the facts, the loan was of most unusual character, a note for $131,000 by a financially irresponsible maker, worth only the value of the collateral behind it. The collateral was a second mortgage on theatrical and business real estate. Such junior securities are open to well-recognized objections. If things go wrong, the holder of them may have to undertake the burden of paying off or financing the senior liens. Such securities are, of course, largely dealt in, but on a basis which takes into account the adverse factors and the necessity for a sufficient margin to support or protect against them. Here there was no support from the maker of the note, and the margin of protection, on any reasonable view of the value of the property including the lease, was at best very low, nothing like such a margin of value as would ordinarily be required on such a transaction where the entire risk of loss was being taken by the bank. Neither the Realty Company in whose interest the property was being purchased, nor Mulloney, nor Deery were undertaking any liability for the payment of this loan. It was a demand note which ordinarily, though not necessarily, would imply collateral having a possibility of quick sale, but there is no evidence, as I think, that this second mortgage could have been sold at that time for the full amount of it, which was the amount of the loan. Nor is the question merely whether the Colonial Theatre property might in good faith have been regarded as worth the amount of the first and second mortgages on it. For a loan of this character under which, as I have stated, the bank took all the risks and other persons all the profit, should there be any, there should have been a large apparent surplus which there clearly was not.

The conclusion seems unavoidable that the loan was obviously improper and of unjustifiable character and could not reasonably have been otherwise regarded. This being so, the approval of the directors given on Mul-

loney's statement and without knowledge of the amount which had been paid for the collateral does not relieve Mulloney and Deery from liability under the statute.

On the final point, Mr. Mulloney's intention to injure or defraud the bank, he was an intelligent and unusually well-trained banker. Nobody knew better than he that this loan ought not to have been made. He approved it in order to assist the Salem Trust Company, the account of which was then overdrawn, to assist Deery who was his business associate and was president of the Salem Trust Company, and of the Salem Realty Company, which was buying the property, and to enable the Salem Trust Company to lend $70,000 to the Federal National Company which was so largely owned by himself and Deery. These motives led him to disregard the interest of his bank and to put upon it a risk of loss far greater than was reasonable or defensible. The evidence indicates the collateral is of substantial value; there is a possibility, though it seems to me a slight one, that the note will be paid. But this fact and possibility seem to me not sufficient to stay conviction under this statute. The defendants contend that they cannot be convicted unless a loss upon the transaction has been proved with the certainty required to establish losses under the income tax statutes. If this contention is sound, the defendants should be acquitted. But I do not think so. Payment of the Ganley note has never been demanded and it has never been put in default either by the Federal National Bank or by Mr. Pearson, as receiver. It is a live security on which interest has been paid to date, and substantial payments of principal are being made. I am, however, unable to agree with the defendants' contention on the evidence on this point, my views being as I have stated them. There is no doubt that Deery acted with Mulloney in the Ganley transaction from the beginning to the end of it and is an aider and abettor under the statute. It follows that both defendants must be found guilty under the first count. I reach this conclusion with much regret because Mr. Mulloney made in many ways a distinctly favorable impression on me; but, of course, I must give judgment on the facts and law as I see them.

As to the second count, this count charged in effect that the whole Ganley transaction was a mere subterfuge to make a loan to Deery, resorted to because the bank could not legally loan him the amount in question without exceeding the legal limit on loans to one person. The count abounds in epithets and charges of fraud which appear to have been taken from previous cases of different character and to have no application here. The Ganley loan was a real transaction correctly entered on the books at the bank. On this count both defendants are found not guilty.

In what I have said I am not undertaking to find a special verdict or state a case for the appellate court. I have tried to make clear here to the parties the views of fact and law on which my decision rests. My formal finding is that on all the evidence I find both defendants guilty under the first count, and not guilty under the second count.