UNITED STATES of America

v.

Jay Ellsworth KREPPS, Appellant.

No. 78–2637.

United States Court of Appeals,
Third Circuit.

Submitted July 9, 1979.

Decided Aug. 24, 1979.

As Amended Oct. 22, 1979.

S. John Cottone, U. S. Atty., Carlon M. O'Malley, Jr., U. S. Atty., Scranton, Pa., Harry A. Nagle, Asst. U. S. Atty., Lewisburg, Pa., for appellee.

John B. Schaner, Lewistown, Pa., for appellant.

Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

By virtue of 18 U.S.C. § 656, officers of national as well as of other federally insured banks are prohibited from willfully misapplying bank funds—that is, converting such funds to their own or to someone else's use. In *United States v. Gallagher*, 576 F.2d 1028 (3d Cir. 1978), this Court held that when a bank officer grants a loan to a named debtor with knowledge that the proceeds will be turned over to a third person, the bank officer has not violated § 656 unless he also knows that the named debtor lacks either the ability or the intent to repay the loan. The major issue presented by this appeal is whether the bank officer in order to violate § 656 must know that the named debtor lacks ability or intent to repay when the bank officer himself is the intended beneficiary of the funds. We con-

clude that, under these circumstances, such knowledge is not required, because the element of willful misapplication is established by the defendant's dual status as loan officer and loan beneficiary.

Appellant's convictions will be affirmed in all respects.

### I.

During 1975 and 1976, Jay Ellsworth Krepps was executive vice president, cashier, and a loan officer of what was then the Reedsville National Bank. The bank's rules—in conformity with the dictates of 12 U.S.C. § 375a[1]—prohibited bank officers from borrowing for themselves more than $5000 from the bank, and required that all loans to officers be approved by the bank's board of directors. In addition, loan officers were required to seek and obtain the board's approval before authorizing any loans in excess of $10,000.

In February 1975, Krepps authorized a loan of $16,000 to Frank and Betty Houser of Milroy, Pennsylvania, and in October of the same year, Krepps approved a loan of $2,500 for Ronald McKinnon of Reedsville, Pennsylvania. Krepps had previously arranged with these borrowers to have the proceeds of each of these loans immediately transferred to himself for his own use. The Housers testified at trial that they signed a note signifying their obligation to the bank as a personal favor to Krepps, who was a friend of theirs, so that he could buy some stock and a jeep. They also testified that they did not endorse the cashier's check for $16,000 that was made out to them, and indeed never saw the check. When they received a notice from the bank that a payment was overdue, Mr. Houser contact-

1. 12 U.S.C. § 375a provides that "[e]xcept as authorized under this section, no member bank may extend credit in any manner to any of its own executive officers. . . ." Similarly, § 375a prohibits bank officers from becoming indebted to their banks except as authorized by the statute. In addition, the act requires a prompt report to the bank's board of directors of any extension of credit to an officer and

demands satisfaction of other conditions as well. Apart from specific types of loans authorized in § 375a, loans in aggregate amounts not exceeding a certain limit are permitted. At the time of Krepps's association with the Reedsville bank, the statutory limit was $5000. Subsequently, the limit was raised to $10,000. Pub.L. 95–630, Title I, § 110, 92 Stat. 3665, Nov. 10, 1978.

ed Krepps, who told him he would take care of it.[2]

McKinnon testified that he signed the note representing his obligations to the bank and endorsed the cashier's check while sitting in Krepps' office, and that the check was cashed immediately, with the proceeds transferred to Krepps at that time. He further testified: "[T]he agreement was that I sign the note, and he would keep the payment book. I would have no papers, no payment book, and he would take care of it, and in turn, he signed a promissory note which I don't know whether it's legal or wasn't, but in case anything happened to him, that I would be covered." As with the Housers, when McKinnon received notices for payment from the bank, he gave them to Krepps, who assured him they would be paid.[3] There is no evidence, however, that either the Housers or McKinnon were capable of repaying the loans and understood that they were legally obligated to do so.

Also, in January 1976, Krepps issued a letter of credit to the Pennsylvania Industrial Realty Corporation, in the amount of $70,000. He did so without first obtaining the requisite authorization from the bank's board of directors, notwithstanding the fact that the Reedsville National Bank had never before issued any letters of credit. Finally, over the course of several months in 1976, Krepps prevented the processing by the Reedsville National Bank, in its usual fashion, of a large number of so-called NSF checks—i. e., checks with "no sufficient funds" to cover them.

For authorizing the loans to the Housers and to McKinnon, Krepps was convicted, after a jury trial, on two counts of willful misapplication of bank funds in violation of 18 U.S.C. § 656, as well as on two counts of making false entries in the bank's records in violation of 18 U.S.C. § 1005. He was also convicted of issuing the letter of credit without authorization in violation of 18 U.S.C. § 1005. And, as a result of preventing the processing of the NSF checks, he was convicted of 132 counts of abstracting bank monies in violation of 18 U.S.C. § 656.

On this appeal, Krepps argues primarily that his convictions on willful misapplication and false entry charges were improper because no evidence was introduced to show that the Housers and McKinnon were other than bona fide borrowers who made a subsequent transfer of the loan proceeds to Krepps in independent transactions that are of no concern to the bank. Krepps maintains that absent such evidence neither willful misapplication nor the making of a false entry can be established.

## II.

In pertinent part, 18 U.S.C. § 656 imposes criminal sanctions on anyone who, "being an officer, director, agent or employee of . . . a national bank or insured bank . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank . . . ."

Of the various substantive offenses named by the statute, willful misapplication is the most flexible in its meaning, inasmuch as it has no common law ancestry.[4] This Court has previously surmised that the term "willfully misapplies" was incorporated in the statute as "an attempt to enlarge the common law definition of embezzlement,"[5] and accordingly, the offense of willful misapplication has been described loosely as "a conversion by a bank employee even though he does not take the money for himself."[6]

In the statute's present codification, no mention is explicitly made of the requirement that the illegal conduct be undertaken with intent to defraud or injure the bank, or, in the alternative, to deceive an officer, agent, or examiner appointed to

---

**2.** N.T. 138–46.

**3.** N.T. 117–19.

**4.** See United States v. Britton, 107 U.S. 655, 669, 2 S.Ct. 512, 27 L.Ed. 703 (1882).

**5.** United States v. Gallagher, supra, 576 F.2d at 1044.

**6.** Id. See also United States v. Britton, supra, 107 U.S. at 666–67, 2 S.Ct. 512.

**104**

examine the affairs of the bank.[7] Earlier versions of the enactment contained such an element, however, and the courts have uniformly continued to construe the criminal acts proscribed in the statute as requiring such intent.[8] It is well settled that "[i]ntent to injure or defraud a bank * * exists if a person acts knowingly and if the natural result of his conduct would be to injure or defraud the bank even though this may not have been his motive,"[9] and that "[s]uch intent may be inferred from facts and circumstances shown at trial and is basically a fact question for the jury."[10] Moreover, "[r]eckless disregard of the interests of the bank is equivalent to intent to injure or defraud,"[11] and a conviction may be returned notwithstanding the fact that the bank has suffered no actual injury.[12]

▮ Because "willfully misapplies" does not connote a precise or specific form of conduct, courts have subsumed within its ambit many types of schemes undertaken to convert bank funds improperly to private use.[13] Nonetheless, when coupled with the intent requirement, and when read in the context of the other acts forbidden by the section, the outermost reach of the section takes on a definite shape: "[I]t is evident that the *mens rea* for the crime is not fulfilled by mere indiscretion or even foolhardiness on the part of the bank officer. His conduct must amount to reckless disregard of the bank's interest or outright ab-

---

7. The crime of willful misapplication of bank funds was originally created by Congress in the Act of June 3, 1864, § 55, 13 Stat. 116. It then appeared as R.S. § 5209, and later as 12 U.S.C. §§ 592 and 597 (1940). Before the 1948 revision of the Code (Act of June 25, 1948, ch. 645, § 656, 62 Stat. 729), § 592 contained the substantive elements of what is now 18 U.S.C. §§ 334, 656 and 1005, and included the phrase, "with intent, [in either case,] to injure or defraud such [bank] . . ., or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs" of the bank. This phrase now appears in § 1005 but not in § 334 or § 656, despite the Reviser's representation that no substantive changes were intended. *See generally United States v. Docherty*, 468 F.2d 989, 994–95 (2d Cir. 1972).

8. *See, e. g., United States v. Schoenhut*, 576 F.2d 1010, 1024 (3d Cir. 1978); *United States v. Schmidt*, 471 F.2d 385, 386 (3d Cir. 1972) (per curiam); *United States v. Docherty, supra*, 468 F.2d at 994–95.

9. *United States v. Schmidt, supra*, 471 F.2d at 386.

10. *United States v. Schoenhut, supra*, 576 F.2d at 1024 (citing *United States v. Tokoph*, 514 F.2d 597, 603 (10th Cir. 1975)).

11. *Id.* (citing *United States v. Wilson*, 500 F.2d 715, 720 (5th Cir. 1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975); *United States v. Stevison*, 471 F.2d 143, 145 (7th Cir. 1973)).

12. *United States v. Fortunato*, 402 F.2d 79, 81 (2d Cir. 1968), *cert. denied*, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

13. *See United States v. Gens*, 493 F.2d 216, 221 (1st Cir. 1974).

Wilful misapplication has been found, for example , 'when a bank employee knowingly engaged in a check "kiting" scheme for the benefit of depositors, *United States v. Mullins*, 355 F.2d 883 (7th Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 540 (1966); when a bank employee paid money out to a customer on a check he knew was backed by insufficient funds and then concealed the overdraft, *Logsdon v. United States*, 253 F.2d 12 (6th Cir. 1958); when a bank officer loaned money without security knowing that the borrower could not repay, *Robinson v. United States*, 30 F.2d 25 (6th Cir. 1929); when a depositor repeatedly overdrew his account, knowing that the branch manager was consistently ignoring this, *Benchwick v. United States*, 297 F.2d 330 (9th Cir. 1961); when a bank officer caused his bank to borrow from another and pocketed the proceeds, leaving his own bank only with a personal note of an employee of the lending bank which he had no reason to think would be paid, *Hargreaves v. United States*, 75 F.2d 68 (9th Cir.), cert. denied, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935); and, as, we have recently held, when a bank officer pocketed the proceeds of loans knowingly issued on the strength of fraudulent loan applications, *United States v. Fortunato*, 402 F.2d 79 (2d Cir. 1968); cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

*United States v. Docherty, supra*, 468 F.2d at 994.

The term "willful misapplication" has been held not to be unconstitutionally vague. *See, e. g., United States v. Cooper*, 464 F.2d 648, 652–53 (10th Cir. 1972); *United States v. Fortunato, supra*, 402 F.2d at 81.

straction of funds."[14] In short, misapplication, not maladministration, is the crime.[15]

The federal judiciary has devoted some attention to the task of drawing a line between bad judgment and bad conduct in those situations in which a bank officer is prosecuted for his role in securing a loan in the name of one party but intended for the use of another. In many such instances, the courts have readily concluded that willful misapplication has occurred. The First Circuit in *United States v. Gens*, 493 F.2d 216 (1st Cir. 1974), has identified three general categories in which convictions have consistently been upheld. This Court has summarized these categories as follows:

> (1) cases in which the bank officer knew that the named debtor was fictitious or that the debtor was unaware of the use of his name for the debt; (2) cases in which the bank officer knew that the named debtor was financially unable to pay back the loan; and (3) cases in which the bank officer assured the named debtor that it would not be obligated to repay the loan in the event of a default and that the bank would look solely to the intended beneficiary of the loan for repayment.[16]

As explained in *Gens*, the result obtained in such circumstances is understandable, for

> [i]n the three situations described above, the loans formally being made could be characterized as "sham" or "dummy" loans, because there was little likelihood or expectation that the named debtor would repay. The knowing participation of bank officials in such loans could consequently be found to have a "natural tendency" to injure or defraud their banks and thus constitute willful misapplication within the meaning of § 656.[17]

When, however, the bank officer grants a loan to a nonfictitious, named debtor who is both financially capable and fully understands that it is the responsibility of such debtor to repay it. *Gens* reasons,

> a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party. Instead, what we really have in such a situation are two loans: one from the bank to the named debtor, the other from the named debtor to the third party. The bank looks to the named debtor for repayment of its loan, while the named debtor looks to the third party for repayment of his loan. If for some reason the third party fails to make repayment to the named debtor, the latter nonetheless recognizes that this failure does not end his own obligation to repay the bank. *In this situation, the bank official has simply granted a loan to a financially capable party, which is precisely what a bank official should do.* There is no natural tendency to injure or defraud the bank, and the official can not be said to have willfully misapplied funds in violation of § 656.[18]

In *United States v. Gallagher, supra,* this Court adopted the approach charted in *Gens* and reversed the conviction of a bank officer who had authorized loans to named debtors but knew that they were intended for someone else. Reversal was held to be mandated because the trial judge neglected to instruct the jury that in order to convict it must find that the officer knew that the named debtors lacked the ability or intent to repay the loans. Without such an instruction, the panel noted, it was possible for the jury to convict solely on the basis of the fact that the bank officer was aware that the loan proceeds would be turned over

---

**14.** *United States v. Schoenhut, supra,* 576 F.2d at 1024.

**15.** *United States v. Britton,* 108 U.S. 193, 206, 2 S.Ct. 526, 27 L.Ed. 701 (1883); *United States v. Britton, supra,* 107 U.S. at 667; *United States v. Meyer,* 266 F.2d 747, 754 (1959).

**16.** *United States v. Schoenhut, supra,* 576 F.2d at 1024–25 (citing *United States v. Gens, supra,* 493 F.2d at 221–222).

**17.** *Id.* at 222.

**18.** *Id.* (emphasis added; footnote and citations omitted).

to another person. Yet, as *Gens* demonstrates, under those circumstances there might well be no intent to defraud or injure the bank or to deceive its officers, and thus no willful misapplication. For, if the named debtor is creditworthy and understands that he is responsible to repay the loan, "the bank official has simply granted a loan to a financially capable party, which is precisely what a bank official should do." How this party chooses to dispose of the fund so obtained should, in the absence of misrepresentation on his part, be of no interest to the bank, and certainly not to the criminal law. The purpose of the applicable statute is to punish only willful misapplications of bank funds.

Moreover, the factual configuration presented by *Gens* and *Gallagher*—namely, where a debtor in turn lends the proceeds of the bank loan to a third party with the bank official's knowledge and acquiescence—is not far removed from the accepted practice whereby a noncreditworthy person persuades a financially responsible friend, relative, or business associate to assume with him, as an accommodation endorser, an obligation to the bank. Concededly, it may be preferable from the bank's point of view to have both persons borrow the money jointly. But the bank does not in fact suffer any injury, nor is it fraudulently induced to make the loan or its officers deceived, when, as in *Gens* or *Gallagher*, only the financially capable person assumes the debt. This is so because in any event the loan was made on the strength of *his* credit, not on the basis of the credit of the ultimate beneficiary.

It is quite a different matter, however, when a bank officer procures the assistance of another person in obtaining the desired funds for his *own* use. In these circumstances, it cannot be said that the bank

officer is doing "precisely what a bank official should do." To the contrary, a jury would be warranted in concluding that the loan transaction was undertaken with intent to defraud the bank or to deceive its officers or examiners, notwithstanding the fact that the intermediary may have been financially capable of repaying the loan and undertook to do so. A jury might plausibly deduce that the bank officer, by channeling the funds through another party, sought to conceal from the bank his own interest in the transaction and thereby to circumvent the barrier—imposed by both the statute[19] and the bank's own regulations—to the bank's making the particular loan directly to him.

Given these severe restrictions on the ability of banks to make loans to their own officers, the officer has committed a fraud upon the bank since the loan might not have been approved had the artifice been disclosed on the face of the loan application. Moreover, by concealing the fact that he is the real beneficiary of the loan, the bank officer has deceived the other bank officers and agents who are appointed to examine the affairs of the bank and who are entitled to be kept informed of all loans to bank officers so that they may properly fulfill their duties.[20] Further, the bank officer has in effect decided whether a loan should be extended to himself, without disclosing to the bank his own interest in the matter. Consequently, he may not have scrutinized the financial affairs of the named debtor as closely as he might have otherwise, and thus may have fraudulently breached his fiduciary duty to the bank.[21]

In light of the *inherently* fraudulent nature of such transactions, it is understandable that various courts of appeals have upheld convictions for willful misapplication

---

**19.** *See* 12 U.S.C. § 375a.

**20.** *See id.*

**21.** Apart from the bank's interest in protecting itself from what may be an unsound loan to a

marginally responsible named debtor, there is the additional interest in maintaining its reputation and avoiding the intervention of federal authorities, pursuant to 12 U.S.C. § 1818, to suspend or remove the bank officer for violating a rule or regulation, or engaging in an "act,

without examining the financial status of the intermediary or his intent to repay the loan.[22] The courts have asserted, without

explanation, that "[a]n officer who knowingly makes loans for his own private gain is guilty of misapplication." [23]

omission or practice which constitutes a breach of his fiduciary duty" and from which he "has received financial gain." The preservation of both these interests is frustrated when a bank officer funnels a loan to himself through an intermediary.

Inasmuch as the requisite element of intent to defraud or deceive the bank, an officer, or agent appointed to examine its affairs is satisfied whenever a bank officer procures an intermediary for the purpose of channeling a loan to himself through that person, there appears to be no reason to require the government to prove, in addition, that the intermediary was either not financially capable of repaying the loan or that he understood that he would not be held responsible for it. Although it may be assumed that often it will not be difficult to prove such additional facts, there may be occasions when difficulties may arise. For example, a creditworthy intermediary may decline to testify that he was assured that he would not be responsible to repay the loan for fear of being prosecuted as an aider and abettor of the criminal offense. *See* note 22 *infra.* Also, it may be difficult to establish that an intermediary is not financially capable of repaying the loan, particularly when he is only marginally responsible financially. Because misapplication on the part of the bank officer must be shown—not merely maladministration or bad judgment on his part in approving the loan, *see* text accompanying notes 14–15 *supra*—a conviction might not be obtainable in such circumstances. Because the elements of the offense, as set forth by Congress, are established here without the additional facts required by *Gens* and *Gallagher*, to impose the burden of proving these additional matters is not warranted by the statute.

Apparently in response to these and other considerations, the First Circuit in *Gens* left open the possibility that in certain circumstances a violation of § 656 may be found even when a financially responsible person assumed the obligation to repay a loan, the proceeds of which were subsequently transferred to a third party. *United States v. Gens, supra,* 493 F.2d at 222 & n.14.

One may plausibly question whether the same result would have obtained in *Gens* had the events underlying that case occurred today. On November 10, 1978, in Pub.L. 95–630, Title I, § 104, 92 Stat. 3644, Congress enacted a new section 12 U.S.C. § 375b, which limits the circumstances in which a bank may make loans to its directors or to persons exercising control over the bank. Inasmuch as the ultimate beneficiary of the loans in *Gens* was a director of

the bank, it may well be that willful misapplication could now be established on the facts of that case even if the intermediary is proven to be financially capable and to have undertaken to repay the loan, in view of the considerations discussed in the text immediately *supra.*

22. E. g., *United States v. Cooper, supra. See also Hargreaves v. United States,* 75 F.2d 68 (9th Cir.), *cert. denied,* 295 U.S. 759 (1935). *But see United States v. Docherty, supra,* 468 F.2d at 995, where only the person who acted as the intermediary was prosecuted for conspiring with a bank officer to violate § 656 and for aiding and abetting the bank officer in the willful misapplication of bank funds. At the time of the loan, he apparently was aware that he would be legally obligated to repay the loan and, indeed, had the means to do so. In our view, *Docherty* is best understood as resting on the proposition that an intermediary who does not have the requisite knowledge that an embezzlement, abstraction, or willful misapplication of bank funds is taking place may not be convicted for conspiring willfully to misapply bank funds or for aiding and abetting the commission of such offense. *See id.* at 992–93, as well as the strong dissenting opinion, *id.* at 995–97.

The First Circuit, in *United States v. Gens,* apparently was of the view that when the intermediary is both financially capable and understands that he is legally obligated to repay the loan, there is no willful misapplication even if the bank officer is the intended beneficiary of that loan. That this is the position of the First Circuit may be inferred from its interpretation of *United States v. Cooper, supra,* and *United States v. Hargreaves, supra,* as involving situations in which the intermediary did not undertake to repay the loan, rather than recognizing that in those cases the bank officers themselves were the beneficiaries of the loans. *See* 493 F.2d at 223.

The Ninth and Tenth Circuits have declined to adopt the approach of *Gens* and *Docherty* even when the funds are sought by a third party. Instead, they have each reaffirmed the position taken previously by them in *Hargreaves* and *Cooper* respectively. *See United States v. Twiford,* 600 F.2d 1339 (10th Cir. 1979); *United States v. Dreitzler,* 577 F.2d 539, 549 (9th Cir. 1978); *United States v. Kennedy,* 564 F.2d 1329, 1338–39 (9th Cir. 1977).

23. *Hargreaves v. United States, supra,* 75 F.2d at 72. *See also United States v. Cooper, supra,* 464 F.2d at 651 (quoting *United States v. Fortunato, supra,* 402 F.2d at 81 ("misapplication

The discussion in *Hargreaves v. United States*, 75 F.2d 68 (9th Cir.) *cert. denied*, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935), is instructive in this respect. There, the president of one bank obtained a loan through a series of transactions involving the vice president of a correspondent bank. The court found no error in the following charge to the jury regarding the requisite element of intent:

> Take the *Brown* incident, for instance. There again upon the question of intent the inquiry arises in my mind: What was the necessity of borrowing that money from the Bank of America in the first place? Does it indicate that the defendant in this action did not want his own bank to know about it at the time? The money admittedly was for his use; why didn't he borrow the money from the bank and give his own note for it? If now, in illustrating the case given you a moment ago, if he could not have gotten that money out of his own bank, then the method used would be a misapplication of funds even though the Brown note was fully secured, because it would be taking the money when the right to take it did not exist.[24]

Though noting that at the time of the loan no inquiry had been made into the creditworthiness of the intermediary,[25] the *Hargreaves* court chose to highlight other aspects of the arrangement:

> The transaction was merely a subterfuge. This method was adopted so that the entries on the books and in the reports would not show the true facts—that appellant was getting this money from the bank. On his record, the unlawful intent is as clear as the misapplication. By putting the transaction in a fictitious form and thus, in effect, representing to the directors and to the bank that he was making this loan to Brown upon the security of his note, when it was not true,

he was deceiving the bank, and incidentally the bank records would not indicate the true nature of the transaction so that government officials would be misled and deceived. In all of this he was deceiving the bank and necessarily defrauding it because of the deceit.[26]

 Essentially, then, it is our view that a willful misapplication in violation of § 656 is established when a bank officer secures a loan for himself by having the bank lend money to a named debtor who then transfers the funds to him, even when the named debtor is financially capable and [fully] understands that it is his legal responsibility to repay the loan. In these circumstances, the very existence of a mediated transaction demonstrates that the bank officer had the measure of criminal intent needed to establish a willful misapplication of bank funds. Because the evidence introduced at trial was sufficient to allow a jury to conclude that Krepps had arranged for the Reedsville National Bank to make loans to the Housers and to McKinnon so that he could then obtain the proceeds of the loans, his convictions under § 656 on the counts arising from those events will be affirmed.

### III.

 Much of our discussion of the charges brought against Krepps under § 656 is relevant to the disposition of his contentions regarding his convictions for violating 18 U.S.C. § 1005. That section prohibits the making of "any false entry in any book, report, or statement of [any Federal Reserve Bank, member bank, national bank or insured bank] with intent to injure or defraud such bank . . . or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank . . . . ."

occurs when an officer of a bank knowingly lends money to a fictitious borrower *or causes the loan to be made to his own benefit, concealing his interest from the bank*") (emphasis added)).

**24.** 75 F.2d at 71–72.

**25.** *Id.* at 70–71.

**26.** *Id.* at 72.

■ The purpose of the statute proscribing false entries is "to give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition."[27] Accordingly, the Supreme Court stated long ago that, "[t]he crime of making false entries by an officer of a national bank with intent to defraud . . . includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the association."[28] In addition, courts have held that in ascertaining whether an entry is false the factfinder may focus on whether the transaction is real and substantial as opposed to merely formal.[29] And, an entry may be false by virtue of an omission of material information as much as by an actual misstatement.[30]

■ In the present case, the bank's books showed loans to the Housers and to McKinnon, but did not reflect Krepps' interest as the ultimate beneficiary of the loans. As discussed above,[31] the fact that there is no evidence demonstrating that the named debtors are incapable of repaying the loans, or that they deny their legal obligation to do so, does not shield the true nature of the transactions; they were designed to facilitate Krepps' borrowing of funds by funnelling them through the named debtors. Because those who are charged by law with the examination of these records have a significant interest in obtaining a full picture of the bank's actual condition, including its relationship to its officers, the true nature of the transaction should have been entered in the bank's records. As we have already seen, a jury may plausibly have determined that Krepps intended to deceive the bank's officers or those appointed to examine its books when he omitted from the bank records any reference to his being the beneficiary of the loan.[32] Thus, because the bank records indicated only the interest of the Housers and McKinnon in the loans, a jury could reasonably conclude that Krepps caused false entries to be made in violation of § 1005, notwithstanding the fact that the named debtors may have been financially capable of repaying the loan and recognized that they were legally obligated to do so.[33]

27. *United States v. Darby,* 289 U.S. 224, 226, 53 S.Ct. 573, 574, 77 L.Ed. 1137 (1933).

28. *Agnew v. United States,* 165 U.S. 36, 52, 17 S.Ct. 235, 241, 41 L.Ed. 624 (1897). The officer responsible for the false entry need not make the entry in the bank's books with his own pen. It is sufficient that he set into motion the actions that necessarily result in the making of that entry in the normal course of business. *United States v. Giles,* 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937).

29. *Phillips v. United States,* 406 F.2d 599, 601 (10th Cir. 1969), (quoting *Laws v. United States,* 66 F.2d 870 (10th Cir. 1933) ("the transaction to which the entry relates must be real and substantial, and not merely formal")). *See also Billingsley v. United States,* 178 F. 653, 663 (8th Cir. 1910), in which the Court stated:

It cannot be the law that officers of a bank may make a sham entry with the intent to deceive, and yet, merely because they go through the idle and deceitful form of making a transaction to which the entry might nominally but cannot really relate, protect themselves from the consequences of their real conduct. Such a holding would facilitate the vicious practice condemned by law.

30. *See United States v. Giles, supra; Morse v. United States,* 174 F. 539, 552 (2d Cir. 1909).

31. *See* part II *supra.*

32. *See* text accompanying notes 10–20 *supra.*

33. For this reason we cannot subscribe to the conclusion arrived at in *United States v. Docherty, supra,* 468 F.2d at 992, that the intermediary through whom funds are channelled to a bank officer has not participated in making a false entry when he is financially capable of repaying the loan and undertakes to do so, because "[t]he loans were recorded as his liabilities, and they are." In our view, the appraisal set forth in the dissenting opinion in *Docherty* is more accurate:

There is simply no doubt that the entries made here (based as they were on the incomplete loan application) conveyed an entirely false impression of the transaction. In fact, the loans were to Docherty in name only. Evans was to be the primary obligor and Docherty was acting solely as his agent. If the bank had been fully informed about the ultimate destination of the proceeds, it would have refused to make the loans as violative of both internal bank policy and state law. See

## IV.

Krepps raises several additional challenges to his convictions [34] which after a careful review of the record we have determined to be without merit. Accordingly, the judgment of the district court will be affirmed.

New York Banking Law § 103, subd. 8. Without Docherty's misrepresentations the scheme would have failed. 468 F.2d at 996 (dissenting opinion). In the related situation in which the ultimate beneficiary of the loan is a third party rather than the bank officer, courts are divided on the question whether a false entry exists. *Compare, e. g., United States v. Mulloney*, 5 F.Supp. 77 (D.Mass.1933) *with United States v. Mulloney*, 8 F.Supp. 674 (D.Mass.1934), *aff'd as to other portions*, 79 F.2d 566 (1st Cir. 1934). Our stance on this issue may well be adumbrated by the opinion in *United States v. Gallagher, supra.*

**34.** In particular, Krepps claims that (1) the indictment was insufficient as to counts one through six because the requisite intent was not charged with sufficient specificity; (2) there was insufficient evidence to convict him of issuing a letter of credit in violation of 18 U.S.C. § 1005 because there was no evidence of any intent to defraud the bank; and (3) there was insufficient evidence to convict him of abstracting NSF checks in violation of 18 U.S.C. § 656 because there was no evidence of any intent to injure the bank.