**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**THERESA FANUAEA GURR LEIATAUA, Defendant**

High Court of American Samoa
Trial Division

CR No. 9-94 and CR No. 44-94

September 18, 1995

Before RICHMOND, Associate Justice, AFUOLA, Associate Judge, and LOGOAI, Associate Judge.

Counsel: For Plaintiff, Henry W. Kappel, Assistant Attorney General

For Defendant, Afoa L. Su`esu`e Lutu

Opinion and Order:

In this criminal prosecution, plaintiff American Samoa Government ("ASG") charged defendant Theresa Fanuaea Gurr Leiataua ("Leiataua") with two counts of larceny or fraud, in violation of A.S.C.A. § 28.0111. These acts were allegedly committed from September to October 1992, and in January 1993, when Leiataua was an officer of the Development Bank of American Samoa ("DBAS"). The lengthy bench trial commenced on May 23 and concluded on June 5, 1995. Leiataua and counsel for both parties were present throughout the trial. The court, having heard testimony and considered the evidence, and pursuant to T.C.R.Cr.P. 23(c), makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Leiataua was employed as the Vice President for Loans at DBAS in July 1988. In January 1993, in accordance with A.S.C.A. § 28.0103(b), Leiataua was appointed President of DBAS by the Governor of American Samoa and confirmed by the Senate. Prior to her employment by DBAS, she worked for the American Savings and Loan in California for about 13 years, including experience as an assistant branch manager for several years and as a branch manager for the final two years, 1985-1987.

DBAS makes direct home loans, whereby it pays the invoices submitted by the suppliers of the building materials and the contractors performing the construction. DBAS further guarantees the payment of direct home loans made in this manner for residential construction by the local commercial banks, either the Amerika Samoa Bank ("ASB") or the Bank of Hawaii ("BOH").

On December 27, 1990, while Leiataua was still the Vice President for Loans, she submitted a request to DBAS for a direct loan of $75,000 for the construction of a residence on the Gurr family's land in the area known as Maloata on the north shore near the western end of Tutuila Island, American Samoa. This amount is the maximum for both direct home loans and guaranteed home loans under DBAS' loan policies.

207

Leiataua's loan file at DBAS contains a letter, dated June 12, 1991, to Leiataua, stating that on March 27, 1991, DBAS' Board of Directors had approved her "application for a guaranteed home loan," subject to providing adequate security by a mortgage of the land and residence and to obtaining credit approval by either ASB or BOH. This form letter calls for Leiataua's signature as the Vice President for Loans and, perhaps for that reason, is unsigned either by her or anyone else.

More importantly, the minutes in evidence of DBAS's Lending Committee and Board of Directors for 1991 do not show any action taken by either body on Leiataua's loan application. Both sets of DBAS's bylaws in effect during this period require the Lending Committee to examine loan applications, make recommendations to the Board for action on the applications, and require the Board to examine and record in minutes the action it takes on all loan applications.

Leiataua claims that during May through July 1991, the Board imposed a freeze on disbursing funds for direct home loans, but the minutes in evidence of the Board for 1991 do not record that the Board either imposed or lifted any freeze on such disbursements. In any event, for that or some other reason, Leiataua decided to apply for a separate direct home loan of $75,000 from ASB. She submitted this application on July 15, 1991, more than six months after her loan application to DBAS. ASB's Lending Committee approved the loan in this amount on July 24, 1991, with terms at 11.5% interest per annum and 120 monthly installment payments of $1,054.46.

On the following day, July 25, 1991, Leiataua signed a "Master Note for Multiple Advances" with ASB in the principal amount not to exceed $75,000, maturing on January 21, 1992, and end-of-month interest payments at the rate of 11.5% per annum on the unpaid balance of the amounts advanced.[1] Inexplicably under the evidence, an ASB real estate lending officer then permitted Leiataua to draw down the entire loan amount within seven weeks, without any underlying invoices or other documentation of actual construction expenses for the house.

---

[1] This multiple advances note was apparently replaced on September 12, 1991, the day of the final draw completing the advances of the entire $75,000, when Leiataua signed a promissory note to ASB and a mortgage of the land and anticipated residence to secure payment of the note. This promissory note was in the principal amount of $75,000, with interest at 11.5% per annum, and provided for 120 monthly installment payments of $1,054.46, commencing October 1, 1991.

On July 25, 1991, Leiataua was allowed to draw $61,190 from the ASB loan, of which $1,190 was used to pay the loan fee and attorney's fee and the remaining $60,000 went directly by cashier's check to Leiataua.[2] This same day, Leiataua endorsed the $60,000 check and gave it for safekeeping to her brother Bernard Gurr ("B. Gurr"), who was then the chief executive officer of the American Samoa Government Employees Federal Credit Union ("ASGEFCU"). B. Gurr deposited the check proceeds in a share account in his name at ASGEFCU and withdrew $2,000 from the account for Leiataua's immediate use and was to hold the $58,000 balance for her. That night, she departed American Samoa on a trip to Los Angeles.

Apparently Leiataua gave the $2,000 to a cousin in California to purchase furniture. Despite telling H.G. Flores ("Flores"), Executive Vice President of ASB, in a February 4, 1992, meeting, that during this trip, she purchased building materials for her house and stored them with her brother, she actually merely priced the materials. She also told Flores that the two $500 draws were also used to purchase materials, and that the last draw was used for interest payments during the construction phase of the loan, shipment of building materials to American Samoa, and land grading. She further told him that the grading was not yet completed, because only one operator would take the needed heavy duty equipment to her remote village, but in actuality his equipment had broken down and then was still in disrepair.

Meanwhile, B. Gurr, instead of safeguarding Leiataua's loan funds, rapidly depleted the $58,000 to his personal ends. By September 30, 1991, just two months after receipt of the funds, he had spent the entire amount, except for a $148.86 share dividend credited to the account on that date. On October 31, 1991, he withdrew this meager remaining amount, leaving the account with a zero balance.

Leiataua deposited the proceeds of the remaining three cashier's checks in her personal checking account at BOH. These funds were commingled with funds from her paychecks and other sources. She spent some of these funds on loan payments to ASB, and for furniture and cabinets for her house, but most of these funds were spent on personal transactions unrelated to the construction of her house, and none of the funds were spent on building materials. By February 13, 1992, the balance in this

---

[2] Leiataua also received cashier's checks from ASB for $500 on August 30, 1991, $500 on September 5, 1991, and $11,862.18, apparently the remaining balance with earned interest, on September 12, 1991.

personal account was reduced to $156.94.

On October 23, 1991, Leiataua submitted an application to ASG's Development Planning Office ("DPO") for a land use and building permit for her proposed residence.[3] DPO issued the permit on November 1, 1991, but the original was never entered into evidence. Despite the issuance of the permit, no residence or other structure has been constructed on the site. The work done was limited to excavating an access road from the main road and some site clearing and grading. On July 9, 1993, DPO inspectors noted that the site has since become revegetated. Leiataua cites the 1991 DPO permit's fourth condition as the reason for the lack of further construction. This condition, which appears in DPO's official copies, postponed construction for two years after leveling the site.[4]

In January 1992, Leiataua resolved to order the building materials and enlisted the assistance of her brother Peter Gurr ("P. Gurr"). She explained that despite the construction delay condition, and her mother's reluctance, she was still hopeful that with the concurrence of her brothers and sister, she could persuade her mother to allow construction of her residence elsewhere on the family's land at Maloata.

---

[3] On July 18, 1994, Leiataua submitted an application to DPO for a renewed land use and building permit. This application is on hold, pending clarification of the record titleholder of the building site. Although not recorded in DPO's official file in evidence, Leiataua claimed that she first sought a permit in June 1991, but DPO never responded. Hence, she filed again in October 1991. She further claimed that she resubmitted an application in 1993. Again, this application is not reflected as such in the DPO file, except possibly by inference from a DPO inspection site visit in July 1993. These three applications are not significant to our decision, except to illustrate Leiataua's continuing desire throughout the time frame involved to construct a residence in Maloata, an intention we do not question.

[4] The inclusion of the fourth condition in the permit is suspect. The original permit, which is usually given to the applicant, is not in evidence, and the DPO official who issued the permit does not recall whether the fourth condition was initially included. The first three special conditions are regularly included in permits, while the substance of the fourth condition is within the expertise of structural engineers and not DPO planners. The permit routinely required construction to begin within 120 days and expired in one year, on October 31, 1992, which is inherently inconsistent with the two-year postponement in the fourth condition. Also, the type used for the fourth condition is different and not aligned with the first three conditions. These circumstances suggest that the fourth condition was added later. However, no evidence shows that Leiataua or anyone acting on her behalf had surreptitious access to her DPO file at any relevant time. Thus, although worth mentioning, the suspicion is not persuasively established, and it is not a factor in our decision.

At her request, B. Gurr provided $50,000.[5] Cloaked with his chief executive officer's position, B. Gurr either directly or in some manner indirectly used the ASGEFCU savings account of Lisona Leiataua, Leiataua's husband, to fund this purpose.[6] In addition, P. Gurr contributed $40,000, $25,000 for Leiataua's order due to loans she had previously made to him and $15,000 for his own order. He obtained these funds from an insurance settlement paid for storm damages occurring during Hurricane Val in December 1991.

Recruiting Jack Yamaguchi, a stateside friend of P. Gurr, an order for building materials, totaling $85,141.89, including freight and other charges, was processed by a Washington state supplier on or about February 26, 1992. The materials were consigned to T & T, Inc. ("T & T"), to the attention of P. Gurr, who was then this company's general manager. They arrived in American Samoa on April 14, 1992, and upon payment of the import excise tax by T & T, were released to P. Gurr on or about April 24, 1992.

P. Gurr stored Leiataua's materials at T & T's premises and took his materials elsewhere. Later, due to Leiataua's inability to proceed with construction of her residence, the decision was made to sell her materials before they deteriorated and in light of the demand for them created by Hurricane Val. Most, if not all of these materials were sold by the end of February 1993 to several local building materials suppliers and some buyers who passed by T & T's premises. Specifically, Tasi Asuega, T & T's principal owner and a Gurr relative, stated that he bought a large amount, paying about $10,000 in cash and still owing about $20,000, which he intended to pay by allowing Leiataua to use his heavy equipment

---

[5] In essence, Leiataua claimed that in January 1992, she thought the $50,000 came out of the $58,000, which she believed B. Gurr was still holding for her, and that although she asked him about the $58,000 at various times, she did not learn about his expenditure of these funds until after this prosecution was commenced. We do not find her testimony on this late discovery credible, and while she may still have been in the dark at the beginning of 1992, we are convinced that she knew or should have known about B. Gurr's waste of the $58,000 by the summer of 1992.

[6] Leiataua claimed that she was unaware of the source of the $50,000 until 1994, but it appears that she may have learned about this source about or after September or October 1992 when her husband applied for a loan of $90,939.46 from ASGEFCU, apparently to consolidate existing loans. In the application, he listed his present occupation as a Vice President of DBAS, for the previous six years, with a salary approximating Leiataua's recompense. During the trial, she still disclaimed any prior actual knowledge of this loan. ASGEFCU gave Leiataua's husband final notice of his default of this new loan in July 1993.

when she started construction.[7]

On June 7, 1993, Leiataua told DBAS' auditors that prior to ASB's contacts with her in July 1992 concerning her loan with ASB, she sold the materials purchased off-island back to suppliers before they rotted and deposited the proceeds in a six-month certificate of deposit. On the same day, however, she told the attendees at DBAS' Executive Committee meeting that she sold the materials to local suppliers, at a profit, and the funds were deposited in a savings account at the American Savings and Loan in Buena Park, California. In actuality, Leiataua received little, if any, of the sales proceeds.

On February 6, 1992, Flores, in his capacity as Vice President of ASB, and concerned about the absence of construction or building materials, and lack of insurance covering loss of the materials, advised Leiataua in writing that ASB required her: (1) to provide an insurance policy of at least $63,000 covering loss of the materials she had purchased for the residence, naming ASB as the loss payee, and to state the exact location of the materials; and (2) to open a savings account at ASB in the minimum amount of $30,356.18, representing the $11,862.18 loan advance she received on September 12, 1991, plus $18,494, the difference between the loan amount and total estimated construction cost. The funds were to be transferred immediately from an existing savings account or later when an existing certificate of deposit matured, if she advised ASB of that maturity date.

Leiataua disclaimed receipt of this letter, even though it was correctly addressed. In any event, she admits to receipt of a later letter, dated July 21, 1992, in which Flores notified Leiataua that she had not complied with the February 6, 1992, directions and was also delinquent in her loan payments, and had until August 6, 1992, to comply with the requests and bring her loan payments current. Leiataua, in response to receipt of this notice, contacted Flores and told him that her loan payments to ASB were current through July 1992.[8]

---

[7] P. Gurr denied that he owned and operated a business under the name "Pete Gurr Lumber Company." The documentation in evidence, however, apparently related to the sales of Leiataua's materials at T & T bears references to this business. The total amount of sales shown in these documents is $31,868.82. Tasi Asuega's purchases account for $11,868.82 of this amount.

[8] ASB also notified Leiataua, by letter dated January 13, 1992, that her loan was delinquent due to nonpayments in October and November 1991. Leiataua returned ASB's letter with her note appended, denying the delinquency, and enclosing her payment book. According to

In September 1992, Flores once more notified Leiataua that the loan was still in default, but she again refuted the delinquency. Frustrated by ASB's stance, Leiataua decided to free herself from this loan. Other factors, however, were surely involved. Her residence was not constructed or under construction. Her land use and building permit would expire on October 31, 1992, and perhaps, in any event, she was stalled from construction by government officialdom until November 1, 1993. More important still, she did not have any building materials. Thus, she could not comply with ASB's demand to know the location and be insured against loss of the materials, and she realized that her good standing with ASB was in serious jeopardy and coming to an end. However, she was without immediate means to repay ASB. She did not have in savings or elsewhere sufficient proceeds, if any at all, from her brother P. Gurr's sale of any building materials she may have purchased in early 1992. She knew that she had spent a substantial portion of the ASB loan proceeds on items unassociated with construction of her proposed residence. Most important, she knew that she had insufficient funds at ASGEFCU to buy out her ASB loan. She either knew that her brother B. Gurr had embezzled most of her ASB loan proceeds, or at the very least she truly believed that these purchase funds came from her ASB loan proceeds still in B. Gurr's hands for safekeeping. She could also obtain more advantageous loan terms from DBAS--a term of 20 years, with 11% interest and monthly payments of approximately $774, compared to 10 years, with 11.5% interest and monthly payments of approximately $1,054 under her ASB loan.

Shortly after her contact with Flores in September 1992 regarding the status of her ASB loan, Leiataua asked Manu Meredith ("Meredith"), who was then DBAS's President, to approve and direct purchase of her ASB loan by DBAS. Apparently, on the strength of the loan approval letter of June 12, 1991, or his knowledge or belief that by then that Leiataua's application for a direct DBAS loan had been properly approved, Meredith sent written directions on September 30, 1992, to DBAS's legal secretary for preparation of the documents needed to purchase Leiataua's loan from ASB.

DBAS's personnel completed the purchase of the ASB loan on October 2, 1992, as Meredith had instructed, for a purchase price of $72,308.95.

---

Leiataua, ASB did not respond to her note, and she assumed that ASB corrected its records. Apparently, other than her meeting with Flores on February 4, 1992, Leiataua next received communication from ASB about the loan when she received Flores letter of July 21, 1992.

Leiataua signed an installment note in the principal amount of $75,000 and a payroll deduction authorization, both dated October 2, 1992, a mortgage of the land and improvements as collateral, dated December 21, 1992, and various other related documents.[9]

DBAS's purchase of the ASB loan is questionable because Leiataua did not submit an application specifically for the loan purchase and a large amount of time had elapsed since her earlier 1991 application. Meredith either ignored the lapse of time because the apparent loan approval of Leiataua's earlier 1990 loan application or did not consider it necessary to update the customary support documentation.[10] Also, neither DBAS's Lending Committee nor Board of Directors reviewed and approved the loan purchase.[11] The 1991 loan approval, assuming it was actually granted, was for a different purpose, a guaranteed home loan, and was inherently flawed, as the application was for a direct home loan and the unsigned record of the approval was for a guaranteed home loan.

On January 22, 1993, Bernadette Fruean ("Fruean"), a loan interviewer and processor at DBAS, prepared a check to reimburse Leiataua in the amount of the remaining balance of Leiataua's loan from DBAS. One of Fruean's duties is to prepare checks in payment of invoices issued for materials and labor provided to DBAS's direct home loan borrowers. Fruean found a disbursement record in Leiataua's loan file showing the undisbursed balance to be $2,691.05 and prepared the check in the amount of the balance, even though she did not have a supporting invoice.

On the same day, Leiataua and another authorized official of DBAS signed the check, as was necessary to negotiate the check, and Leiataua endorsed and deposited the proceeds of the check in an account at ASB, which she

---

[9] She apparently made loan payments until at least June 7, 1993, when DBAS placed her on administrative leave with pay, and probably made payments until she left DBAS's employment at a later date.

[10] As pointed out by DBAS's independent auditors as a result of their inspection of Leiataua's loan file in 1993, the file lacked current credit information when DBAS purchased the ASB loan, such as verification of deposits from other banks, documentation of hazard and life insurance, copies of last paid utilities bills, and a copy of her last pay stub.

[11] On June 7, 1993, Leiataua told the independent auditors and later members of the DBAS's Board of Directors attending an Executive Committee meeting, which was called to review, among other matters, Leiataua's loan file with her, in essence, that she thought it unnecessary to go through the loan underwriting process again. She also told the auditors that she thought the DBAS loan was adequately secured by the site for her residence and her life insurance benefit provided by DBAS.

214

apparently maintained despite her dissatisfaction with ASB's management.

On January 26, 1993, Fruean obtained from Makisi's Home Improvement Center, with the help of a friend employed there, a so-called "pro-forma invoice--quotation only" for Leiataua's purchase of building materials. The amount of this invoice, $2,701.45, exceeded the loan balance which was disbursed by the January 22, 1993, check. The invoice form was designed to permit customers to obtain advances from their home construction loans and would be replaced by a payment receipt when the customer made actual payment and took delivery of the materials. However, at some point during this transaction, someone noted "Paid Cash" on this pro-forma invoice and enabled its use in back-up support of loan balance disbursement. Although Makisi's did not in fact sell or deliver materials to Leiataua, the pro-forma invoice was used for this purpose.

Contradicting Fruean's testimony, Leiataua denied instigating either the loan balance check or false invoice, or participating in the latter in any manner. Fruean was not a strong witness. She was hesitant and uncertain at times, made partially inconsistent prior statements, and may have committed some acts which bring her truthfulness into question. On this basis, we will give Leiataua the benefit of any doubts. She may not have initiated either of these transactions. However, she admitted that the same legal secretary who prepared the loan purchase documents asked her if she wanted to be reimbursed for the amount of the loan balance, and that she did not purchase any materials justifying reimbursement. Unquestionably, Leiataua signed the loan balance check and received the proceeds and knew that the false invoice was used to support the disbursement. This disbursement is on the same footing as the purchase of the loan from ASB.

## CONCLUSIONS OF LAW

Appropriate to this case, the elements of the offense charged in CR No. 44-94 are:

1. on or about September and October 1992,
2. in American Samoa,
3. the defendant,
4. then an officer of DBAS,
5. with intent to injure or defraud DBAS, or any other person,
6. embezzled or misapplied moneys or funds of DBAS, to wit: disbursement of DBAS's funds, without proper authorization, to purchase her direct construction loan from ASB.

215

The elements of the offense charged in CR No. 9-94 are:

1. on or about January 1993,
2. in American Samoa,
3. the defendant,
4. then an officer of DBAS,
5. with intent to injure or defraud DBAS,
6. embezzled or misapplied moneys or funds of DBAS, to wit: disbursement of DBAS's funds, without proper authorization, as a reimbursement to her, or made a false entry in DBAS's records or performed another fraudulent act, to wit: use of a false invoice for the purchase of building materials.

Indisputably, as to both charges, ASG has proven the first four elements beyond a reasonable doubt. The court is equally satisfied that ASG has proven the sixth element of each offense beyond a reasonable doubt.

Undeniably, Leiataua caused DBAS to expend its funds as a direct loan to her to purchase her direct home loan from ASB. DBAS' Lending Committee and Board of Directors are required to approve this loan, under DBAS's bylaws and did not do so. This disbursement was clearly a misapplication of DBAS's funds.

Undoubtedly, Leiataua participated in the disbursement of DBAS' funds reimbursing her for a purchase of building materials, which she did not in fact buy, and supported by placing in DBAS's records a fictitious invoice. This, too, was a misapplied expenditure of DBAS's funds.

The only genuine issue before the court, with respect to both counts, is whether or not Leiataua acted with the requisite intent to injure or defraud DBAS.

 In addition to proving that Leiataua committed the act of larceny, fraud, or misapplication of funds, ASG has the burden to show that she acted "with the intent to injure or defraud the bank." A.S.C.A. § 28.0111, which mirrors 18 U.S.C. §§ 656, 657. Intent to injure or defraud a bank exists when the defendant acts knowingly and the natural result of this conduct would be to injure or defraud the bank, regardless of motive. *United States v. Krepps*, 605 F.2d 101, 104 (3rd. Cir. 1979). It is not required that the bank suffer a loss or injury, since the intent of the law is to protect the bank's right to make its own decisions regarding the use of its funds. *United States v. Cauble*, 706 F.2d 1322, 1355 (5th Cir. 1983). Furthermore, there exists an inherently fraudulent nature to

216

bank loans made by officers for their own benefit. *United States v. Krepps*, 605 F.2d at 106.

Considering Leiataua's position as the Vice President for Loans with DBAS at the time of the loan purchase, in addition to her actions in securing the loan and the misapplication of the funds for purposes other than construction of a residence, we conclude that the evidence shows beyond a reasonable doubt that she committed these acts with the requisite intent to injure or defraud, as required by A.S.C.A. § 28.0111.

The people of American Samoa are entitled to have their development bank, as a public financial institution, managed with impeccable integrity. The events underlying the instant charges show a decided failure to meet this standard. These events are marked by improper procedures and faulty documentation, by the lack of exercising effective internal controls, and above all by a bank official's intolerable use of insider advantage.

## DECISION

Leiataua is guilty of both counts of larceny and fraud in violation of A.S.C.A. § 28.0111, as charged in the consolidated informations.

Leiataua is continued on bail in the sum of $10,000, pending sentencing, on the condition that she is present before the court whenever required. The Attorney General shall retain her travel documents. ASG's stop order prohibiting her departure from American Samoa, unless by prior court order, remains in effect.

Leiataua shall be present before the court for sentencing on October 20, 1995, at 9:00 a.m. The presentence report will be completed and made available to the court and counsel not later than October 18, 1995.

It is so ordered.