**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Douglas CORDELL,**
**Defendant–Appellant.**

**No. 89–6051.**

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1990.

---

Otis Carroll, Ireland, Carroll & Kelley, Tyler, Tex., for defendant-appellant.

Bob Wortham, U.S. Atty., Tyler, Tex., Paul Naman, Jeffrey J. Strand, Asst. U.S. Attys., Beaumont, Tex., for plaintiff-appellee.

Before GOLDBERG, GEE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Douglas Cordell, a former bank president, appeals his conviction on counts of making a false entry in bank records and willfully misapplying bank funds. Agreeing with the district court's interpretation of the relevant criminal statutes and finding no reversible error in Cordell's convictions, we affirm.

I.

In April 1987, Douglas Cordell was President and Chief Executive Officer of American National Bank (ANB) Tyler, Texas. The bank is now defunct. Joseph M. McMurrey had been a customer of ANB since 1985. In late 1985 and early 1986, ANB made two $150,000 loans, secured by real estate, to McMurrey. At that time the loans were within the bank's legal lending limit.[1]

In early 1987, the assets of ANB began to decline. As a result, the bank's legal lending limit was decreased and the amount of McMurrey's loans exceeded that limit. McMurrey's loans did not constitute a violation under 12 U.S.C. § 84, however, since they were not greater than the lending limit in effect when the loans were made. Rather, the loans were considered to be "nonconforming" or "out of compliance." With that status, future extensions of credit could result in § 84 violations.

In 1987, federal bank examiners descended upon ANB to investigate possible § 84 violations. When their investigations yielded a number of violations, bank examiners placed several customers on a watch list. McMurrey was one of them.

To prevent future § 84 violations, ANB implemented a system to prevent any loans or overdrafts in the accounts of McMurrey and other similarly situated customers. ANB's Board of Directors charged Cordell with the personal responsibility of ensuring that no future violations occurred.

On April 16, 1987, McMurrey purchased a $9,316.09 cashier's check from ANB with $3,726.85 from his ANB accounts and a $5,400 check drawn on his account at Bank of Longview. ANB's system required Cordell's approval before the purchase could be made. Cordell spoke with McMurrey, who gave his assurances that he had a draw coming on the Longview account. Cordell and McMurrey then contacted the Bank of Longview and spoke with the President's secretary. She apparently confirmed that a draw was being processed and would be honored.[2] Only after that confirmation did Cordell approve the transaction.

The following day, the Bank of Longview declared that there were insufficient funds to cover the check and notified ANB of the insufficiency by telephone. The check was physically returned on April 23, 1987, one week later. The returned check meant that funds had been disbursed to McMurrey by ANB without funds to draw upon in his account at the Bank of Longview. Were the check "charged back" to McMurrey's

---

1. 12 U.S.C. § 84 places a limit on the amount of loans a bank may make to a single customer, based on a percentage of the total equity of the bank. That limit is considered the legal lending limit.

2. At trial, the president's secretary testified that she recalled the telephone call but not its specific content. Both Cordell and McMurrey testified that she told them the draw was being processed.

account, it would have pushed McMurrey over the legal lending limit.

The day after the check was returned, ANB's cashier claims she went to Cordell and informed him that the check would need to be charged back against McMurrey's account. She apparently had contacted the Bank of Longview again and had been told that McMurrey did not have the funds in his account to cover the check. Moreover, the Bank of Longview informed the ANB cashier that it was holding a $5,400 insufficient funds check drawn on a McMurrey account at ANB.[3] In an attempt to avoid a § 84 violation, Cordell resubmitted the check to the Bank of Longview for payment. He claims that before sending the check back through, he contacted McMurrey, who assured him that he had the necessary funds in the Longview account. The check was again dishonored. It was returned to ANB on April 29.

In a continuing attempt to avoid a legal lending violation,[4] Cordell decided to make "late returns" on several checks written by McMurrey that already had been honored by ANB.[5] He chose five checks that he felt he could return with few consequences. These checks included checks to McMurrey's wife and to one of McMurrey's employees. Cordell ordered those five checks reversed and had money withdrawn from the accounts of the third parties and deposited into McMurrey's account. Cordell also had all the money in other Cordell accounts transferred to the account on which the check had been written. Combined, these two procedures made up the amount deficient on the $5,400 check. Shortly thereafter, McMurrey covered all the returned checks and no loss occurred to the bank or any of its customers. Cordell never

charged back the check to McMurrey; that is, he never recorded that an overdraft had taken place.

The following month, a bank examiner determined that an overdraft should have been posted on April 30, the day after the check was returned the second time. Cordell's reversal of the five checks was an attempt to disguise the fact that a § 84 violation had occurred. Cordell was indicted and tried on one count of bank fraud, under 18 U.S.C. § 1344, one count of false entry in bank records, pursuant to 18 U.S.C. § 1005, and one count of misapplication of bank funds, under 18 U.S.C. § 656. He was convicted on the latter two charges and received a one year suspended sentence and three years supervised probation. Claiming three points of error, Cordell appeals the convictions.

## II.

Cordell first argues that his conviction for making a false entry in ANB's records, pursuant to 18 U.S.C. § 1005, cannot be sustained. He reasons that because he clearly and accurately recorded the transactions that took place, particularly the late returns made on the five checks, he did not make any entry that was "false." Arguing that the charge in the indictment specifically refers to those late returns as the false entry, Cordell maintains that his conviction was improper. The assertion is that the government, upon learning at trial that the returned checks were properly recorded, changed its theory to suggest that the false entry was Cordell's failure to record the overdraft. That variance from the original indictment, he contends, was improper. Because we find no error with the

3. This situation formed much of the basis for the government's allegation that there had been a "check kite." Because the jury found Cordell not guilty of the bank fraud charge, however, this fact is only relevant on appeal to show that Cordell had an idea that the check would be returned a second time but still chose to send it through because of his desire to prevent a § 84 violation.

4. The government contends that once the check was returned the second time, the § 84 violation already had occurred. It argues that since there

were insufficient funds to cover the check, Cordell essentially extended credit to McMurrey when he approved the transaction. Consequently, Cordell had no means available to him to "avoid" the violation.

5. A late return is made when a check has been present in the bank for over 24 hours. It becomes a late return at that point because, once a check has not been returned within a 24 hour period, it is generally assumed that the check has been honored.

district court's conclusion that Cordell made a false entry in ANB's records, through a material omission, and because we find the grounds for that charge within the scope of the indictment, we reject Cordell's claim.

■ In 1987, at the time of Cordell's acts, 18 U.S.C. § 1005 read in pertinent part: [6]

> Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.[7]

The statute's purpose is to ensure that inspection of a bank's books will yield an accurate picture of the bank's condition. *United States v. Darby*, 289 U.S. 224, 226, 53 S.Ct. 573, 574, 77 L.Ed. 1137 (1933); *United States v. Manderson*, 511 F.2d 179, 180–81 (5th Cir.1975). The critical interpretation of this statute is that an omission of material information qualifies as a false entry. *See United States v. Jackson*, 621 F.2d 216, 219 (5th Cir.1980) (citing *United States v. Krepps*, 605 F.2d 101, 109 (3rd Cir.1979)); *see also United States v. Kington*, 875 F.2d 1091, 1104 (5th Cir.1989).

■ Cordell insists that he properly recorded the late return of checks and that he therefore did not violate § 1005. He maintains that § 1005 cannot be violated if all the transactions entered are accurate. To this end, he relies on our opinions in *United States v. Hughes*, 726 F.2d 170 (5th Cir.1984), and *United States v. Manderson, supra.* We find this reliance misplaced for two reasons. First, neither *Hughes* nor *Manderson* involved an omission of material information. Rather, they both dealt with whether certain information that had been recorded constituted a false entry. Second, neither case involved an entry made that, although accurate, was made for the purpose of deceiving bank examiners. Indeed, in *Manderson* we expressly stated that the entry made was not intended to conceal anything from the bank or other parties involved.[8]

The present case, then, differs markedly from those on which Cordell relies. Evidence at trial showed that an overdraft occurred on McMurrey's account as a result of Cordell's extension of credit to McMurrey on a bad check. Cordell chose to omit from the bank records any overt indication that such an overdraft took

---

**6.** In 1989, Congress amended § 1005. Among other things, it increased the possible penalty to $1,000,000 and twenty years imprisonment. *See* 18 U.S.C.A. § 1005 (West Supp.1990).

**7.** To establish a violation of § 1005, the government must prove that (1) the entry is false; (2) the defendant made or caused to be made the entry; (3) the defendant knew the entry was false at the time he or she made it; (4) the defendant intended that the entry injure or deceive the bank officers or public officers. *United States v. Jackson*, 621 F.2d 216, 219 (5th Cir.1980).

**8.** The decisions in *Manderson* and *Hughes* resulted, in part, from a century long line of cases beginning with *Coffin v. United States*, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895), where the Supreme Court gave a restrictive technical reading to the false entry statute. There, the court ruled that "an entry in which that which has been done by the officers or agents of the bank is correctly set forth in detail is not a false entry." *Coffin*, 156 U.S. at 462, 15 S.Ct. at 406. As early as two years later, though, the court began to modify the rule to allow a violation of the false entry statute where the entry on the books, though accurate, was known to be fraudulent. *See United States v. Darby*, 289 U.S. at 226, 53 S.Ct. at 574 (discussing *Agnew v. United States*, 165 U.S. 36, 52–54, 17 S.Ct. 235, 241–42, 41 L.Ed. 624 (1897)); *United States v. Gleason*, 616 F.2d 2, 29 (2nd Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980), *cert. denied, Carter v. United States*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980). Since *Agnew* and *Darby*, the law as to what constitutes a violation of the false entry statute has continued to evolve from the restrictive technical reading of the term "false entry." The recognition by this Court (as well as other courts) that a material omission qualifies as a false entry is one manifestation of that evolution.

place. He omitted the overdraft by not recording it and supported his action by late return of the five checks.[9] Evidence of this omission is sufficient to sustain the § 1005 conviction. As a result of this lack of material information, ANB's books clearly did not accurately reflect the bank's condition.

■ Cordell counters, however, that the indictment did not charge him with a material omission. The false entry count of the Second Superseding Indictment alleges that Cordell

> [made] a material false entry in a book, report, and statement of [ANB] by reversing previously paid checks totalling approximately $3,726.85, drawn on the American National Bank, Tyler, Texas, thus preventing and attempting to prevent discovery of Joe M. McMurrey's, Defendant DOUGLAS CORDELL's loan customer, further exceeding his loan limit and the check kite.

Focussing on the first part of this language, Cordell claims that the government did not inform him of its theory involving the omission. In making this argument, though, Cordell neglects to discuss the final part of the language that clearly indicates that there is a charge of an omission. In essence, the charge states that McMurrey exceeded his loan limit as a result of Cordell's actions extending him credit. Cordell sought to prevent discovery of that overdraft and did so by not recording the overdraft and then reversing the checks in an attempt to prevent the overdraft's discovery.

Not only do we find the language in the indictment itself sufficient to give Cordell notice of the omission charge, but we find his claim that he was surprised at trial by the omission theory disingenuous. Prior to trial, the government submitted its request for jury instructions. Included in its request for instructions on the false entry count was a statement specifically explaining that an entry may be false by virtue of an omission of material information. In support of that instruction, the government cited *United States v. Krepps, supra.* Through that proposed instruction, the government put Cordell on notice that it would take the position that the omission constituted a false entry. Even as that theory developed throughout the trial, Cordell did not contest its validity. In fact, just before closing arguments at trial, the judge met with the attorneys to allow them to examine the court's proposed jury instructions. A portion of those instructions regarding the false entry count read:

> The aim of the false entry statute is to give assurance that upon an inspection of a bank, public officers and others will discover in the books of account a picture of the true condition; and an omission of material information relating to matters which should be disclosed in order to show a true picture of the transactions involved, as well as an actual misstatement, qualifies as a false entry under the statute.

While the language of several portions of the instructions was discussed at the conference, this language was not. Cordell raised no objections to it. The instructions were then given to the jury, both orally and in writing.

We find no reversible error in Cordell's conviction under 18 U.S.C. § 1005. The trial court properly instructed the jury as to the elements and nature of a false entry. The record reveals evidence sufficient to prove that Cordell's conduct met those requirements beyond a reasonable doubt.

### III.

■ Cordell complains of the government's introduction of evidence of alleged prior violations of lending limits at ANB. Cordell argues that the evidence was highly prejudicial and irrelevant to the case

9. We find that the record is sufficient to show both that a material omission took place and that Cordell returned the checks in an attempt to conceal that omission. Accordingly, the late returns were the means by which he undertook to justify omitting the information. In any event, even if the late returns were not the means by which Cordell omitted the material information but rather just actions taken in addition to the omission, the fact is that the omission occurred.

against him. Therefore, its admission constituted reversible error. We find that the evidence had significant probative value and that the district court took proper precautions to prevent the evidence from improperly prejudicing the jury.

Federal Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before permitting the introduction of 404(b) evidence, a trial court must apply a two-step test. First, it must determine that the evidence is relevant to an issue other than the defendant's character and, second, it must conclude that the probative value of the evidence outweighs the prejudice that might result from its introduction. *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). We may only review the trial court's decision as to whether to admit the evidence on an abuse of discretion standard. *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir.1986).

▮ In this case, the district court did not abuse its discretion by permitting introduction of the evidence. The record evinces correct application of the *Beechum* test. Before trial, Cordell filed a motion *in limine*, asking that the government be precluded from introducing evidence regarding any past civil violations by Cordell or the bank. The government opposed the motion, arguing that it needed to present evidence of the past lending limit violations to establish Cordell's motive and intent to conceal the violation at issue. The trial court denied the motion. We agree with the trial court that the evidence was relevant to show motive and intent.

The evidence of past lending limit violations was obviously relevant to assessing whether Cordell was guilty of the charged conduct. "Evidence is relevant if it makes the existence of any fact at issue more or less probable than it would be without the evidence." *United States v. Williams*, 900 F.2d 823, 826 (5th Cir.1990); *Beechum*, 582 F.2d at 911. In this case, knowledge of past lending limit violations made it more likely that Cordell would conceal the overdraft. That is, the jury could only appreciate Cordell's motives for concealing the civil violation by knowing that past violations had occurred, that as a result of those violations bank examiners had created a list of accounts to be watched, that McMurrey was on that list, and that Cordell was made personally responsible for ensuring that McMurrey obtained no further debt to ANB.[10]

We also conclude that the evidence did not cause Cordell improper prejudice. Any prejudice the evidence might have caused was cured by the trial court's constant and careful admonitions to the jury about the meaning and purpose of the evidence. Before the government's opening statement, the court ruled on the *in limine* motion. In denying the motion, the judge made it clear that he would instruct the jury that the criminal prosecution could not be based on a violation of the civil statutes. In its opening argument, the government told the jury that the civil violations were meant only to show intent or motive. More important, when the evidence was first introduced at trial, the judge instructed the jury that it is not a crime for a bank to exceed its lending limit. He then detailed the difference between a civil penalty and a criminal penalty and instructed the jury only to consider the evidence for the purposes of motive or intent.

---

10. Cordell argues that the evidence was irrelevant because the government made no attempt to relate the § 84 violations to Cordell's intent. To this end, he complains that the prosecution did not show how Cordell's past actions were similar to the ones for which he was charged. Cordell, however, fails to accept the relevance of the evidence to establish his *motive.* As we explained in *Beechum*, "overall similarity is not required when the offense is introduced to show motive." *Beechum*, 582 F.2d at 912 n. 15. Of course, this evidence also goes to intent since, if Cordell had a motive, it is more likely that he intended the action.

When the issue arose again and Cordell's attorney asked for a continuing objection to questions about past violations, the judge instructed the jury:

> Again, let me warn the members of the jury that the fact that there are legal lending violations is not a criminal offense in itself. This just subjects the bank to civil penalties which is not the same thing as crime. The only reason that this evidence is being admitted is for the purpose of your determining, if it does aid your determination, whether or not the defendant had the intent and purpose of violating the law that [is] ... charged against him in the indictment. You are going to have to first believe that he violated the law in connection with what's charged against him in the indictment. If you believe that, then this particular evidence may be of aid to you and that's up to you as to whether it is or not in determining whether or not he had a motive or intent to commit these acts that constituted the violation of what's charged in the indictment.

In the final instructions to the jury, the judge again explained the limited purposes for which the jury could consider evidence of lending violations.

We have no doubt, then, that the court in no way abused its discretion by allowing the evidence of prior lending violations. The evidence went straight to the issue of motive and intent, and the court protected Cordell from improper undue prejudice.

■ Cordell also complains of the government's characterization of certain transactions it raised by questioning during cross-examination of McMurrey. McMurrey was questioned about his past "overdrafts" on ANB accounts, and the questions referred to a letter from Cordell to McMurrey regarding a number of those "overdrafts." Cordell argues that the checks had been returned for insufficient funds and that the letter accurately reflected that fact. Accordingly, he argues that it was error for the government to refer to the transactions as overdrafts. Since the letter was not introduced as evidence and the jury was not allowed to examine it, Cordell argues that the jury was left with an improper impression of the letter's contents.

We reject Cordell's claim for two simple reasons. First, Cordell's attorney never objected to the line of questioning at trial. Since he does not now convince us that allowing the characterization of the transactions as overdrafts was plain error, his claim cannot prevail. *See United States v. Reed*, 670 F.2d 622, 623 (5th Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982) (citing Fed.R.Crim.P. 52(b)). Second, any conceivable error that might have been made was cured by Cordell's attorney's redirect examination. His questioning resulted in making clear Cordell's contention that the letter referred to "NSF" (non-sufficient funds) checks, not overdrafts. He then went on to suggest a purported distinction between NSF checks and overdrafts by developing evidence that McMurrey had authorized ANB to transfer funds from other accounts to handle or prevent "overdraft problems." Accordingly, Cordell's attack on the government's line of questioning must fail.

## IV.

Finally, Cordell contests his conviction for misapplication of funds for the late return he made on the five checks. He generally states that the prosecution failed to introduce sufficient evidence to sustain his conviction under 18 U.S.C. § 656. Although he claims to challenge the sufficiency of the government's evidence, in reality he does not make that challenge. His argument has two parts. First, he argues that the government bootstrapped his conviction by claiming a purported violation of a banking regulation. He contends that he did not violate the banking regulation, and that, even if he had, doing so could not constitute a criminal violation. Second, he asserts that no evidence was ever introduced to show that the funds of ANB were misapplied. If any funds were misapplied, he maintains, they were funds in the hands of the Federal Reserve, not ANB. We find no merit to either of these claims.

18 U.S.C. § 656 reads in part:

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any money, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be [fined or imprisoned or both].

The government argued and the jury found that Cordell violated the statute by making the late reversals on the checks. The government's theory is that by the time Cordell made the late returns, ANB had become responsible for the checks. Therefore, Cordell's reversal of the checks, in an attempt to avoid or conceal a § 84 violation, constituted a misapplication of bank funds.

■ As part of its undertaking to prove this claim, the prosecutor questioned several of the witnesses about Regulation J. That banking regulation requires that a bank, under normal circumstances, honor or return a check presented to it by the end of the business day in which it receives it. Cordell argues that the government bootstrapped a violation of a banking regulation into a § 656 violation. Citing our opinion in *United States v. Christo*, 614 F.2d 486 (5th Cir.1980), he argues that such bootstrapping was error. *See Christo*, 614 F.2d at 492 (disallowing a conviction that resulted from the government's attempt to bootstrap, among other things, a civil regulatory violation, into a § 656 violation).

We agree with Cordell's statement of the law but see no application of that law to his case. We find no basis for Cordell's contention that his conviction was tied to a violation of Regulation J or any other civil regulation. Cordell's case bears no resemblance to *Christo*. In *Christo*, the trial court had specifically instructed the jury to view the occurrences in that case in light of certain civil restrictions. It then recited the civil statute to the jury. *See Christo*, 614 F.2d at 490–91. On appeal we found plain error and reversed the conviction, finding that the civil violations were legally irrelevant to the case and that the government had bootstrapped a § 656 conviction from those violations. *See id.* at 492. None of the errors made in *Christo* was made in Cordell's case. Regulation J was used only to show that responsibility for the funds had shifted to ANB and that Cordell therefore misapplied bank funds by reversing the checks. Neither Regulation J nor any other civil regulation was referred to in the instructions to the jury. Moreover, the trial court's admonitions to the jury regarding § 84 violations likely prevented any possible bootstrapping of this conviction.

■ Cordell also argues that the § 656 violation cannot stand because Cordell did not misapply any of ANB's funds. He makes a highly technical argument, the gist of which is that the funds were never intrusted to ANB, as required by § 656. Instead, he argues, the crediting of all the reversed checks—including the check that had been deposited in ANB—was done through the Federal Reserve. When the checks were reversed, the Federal Reserve merely credited McMurrey's account. Cordell maintains that, because ANB did not have possession of the funds, § 656 was not violated.

We find no basis for this novel claim. Section 656 requires only that the misapplied funds be "intrusted to the custody or care" of the bank of which the defendant is an agent, officer, employee or director. It does not require that the bank retain ownership of the funds. The government properly points out that once the funds were returned to ANB, those funds were in the care and custody of ANB. And since ANB maintained responsibility for those funds already dispersed, Cordell's actions that credited McMurrey's account with those funds constituted misapplication.

The judge properly advised the jury as to the elements of a § 656 violation. Apply-

ing the evidence introduced in this case to those elements, the jury reasonably could find that Cordell misapplied funds intrusted to ANB's care and custody.

Finding no reversible error, we affirm Cordell's convictions for false entry and misapplication.

AFFIRMED.

GEE, Circuit Judge, dissenting:

The majority today affirms a bank president's felony conviction for making a false entry in the bank records on the theory that his failure to record an overdraft amounts to an omission punishable under 18 U.S.C. § 1005. The prosecution, however, did not indict Cordell for this offense. Rather, it indicted him for actually *making* a false entry—a thing he did not do. The majority also allows a conviction for the willful misapplication of bank funds to stand even though Cordell's actions—actions which the government contends constitute willful misapplication primarily because they conflict with a civil banking regulation—are countenanced by Federal Reserve operating procedures. Cordell's conduct, ill-advised as it may have been, is not criminal and does not merit that stigma; therefore, I respectfully dissent.

The majority devotes much of its opinion to a discussion whether an omission of material information qualifies as a "false entry" under 18 U.S.C. 1005. I have no quarrel with their conclusion that such omissions do so qualify, but I maintain that this discussion is premature. Cordell was not indicted for making a material omission from the bank records, but rather for making a "material false entry ... by reversing previously paid checks." At trial, however, the government failed to prove that any false entry occurred. The testimony from both government and defense witnesses shows that the late returns authorized by Cordell on the five checks drawn on Mr. McMurrey's account were properly posted by Cordell and were not recorded early, late, or in any other manner so as to avoid detection by bank examiners. The government contends and the majority concludes, however, that the overall language of the indictment notified Cordell that the

government was charging him with a material omission—that of failing to record an overdraft in Mr. McMurrey's account. This latter theory, ultimately relied on by the prosecution at trial, is entirely different from the theory alleged in the indictment. The government's omission theory allowed the prosecutor to argue to the jury that the late returns—recorded in the proper accounts, at the proper time and in a proper manner—amounted to criminal conduct because the returns prevented the entry of an overdraft in the account.

The lack of specificity in the indictment was particularly harmful to Cordell given that it is difficult to find anything false or misleading about his conduct. It is true that Cordell made late returns on the checks to avoid a § 84 violation, but the record reveals that he made no effort to conceal these entries from the bank examiner, even though he knew that the account was on the examiner's "watch list." By hindsight, it appears that the entries were improper from the bank examiner's viewpoint; they were not, however, false, and the fact that Cordell recorded late returns in Mr. McMurrey's account instead of an immediate overdraft does not result in a material omission of the kind intended to be prevented by 18 U.S.C. § 1005.

Cordell's conviction for willfully misapplying government funds is also without basis. The government, seeking to prove Cordell's intent to defraud the bank and bank examiners, introduced a litany of American National's civil "legal lending limit" violations and lists of customer's overdrafts charged back to their accounts—of the normal "bounced check" variety—without connecting any of these occurrences to Cordell personally or to the time period of Cordell's responsibility for such violations. Although irrelevant, the introduction of this misleading evidence might not constitute reversible error were it not for the prosecution's reliance on Cordell's alleged civil violation of Regulation J to prove that he willfully misapplied the funds—proof that was necessary to a § 656 conviction.

Cordell made a late return on five checks in Mr. McMurrey's account to avoid a civil violation of § 84. Testimony at trial demonstrated that Federal Reserve procedures allow a bank to make a late return on checks which it has previously electronically honored if they are still held by the bank—as were these. As a result of the late returns, the Federal Reserve credited the amount of the five checks to Mr. McMurrey's account, placing the burden of paying them back on Mr. McMurrey. Subsequently, all of the checks were paid in full with no loss whatever, either to the bank, to the payees on the checks, or to the Federal Reserve. The prosecution, thus, was hard pressed to prove that any funds were ever misapplied by Cordell. To prove the element of misapplication, the government introduced evidence that Cordell "violated" civil banking Regulation J, which requires that a bank, under "normal circumstances", return or honor a check by the end of the business day in which it was presented. The government's reliance on a violation of a civil regulation to prove the willful misapplication element constitute precisely the sort of bootstrapping condemned by us in *United States v. Christo*, 614 F.2d 486, 492 (5th Cir.1980). In *Christo*, we held that "[a] conviction, resulting from the government's attempt to bootstrap a series of checking account overdrafts [and] a civil regulatory violation into an equal amount of misapplication felonies, cannot be allowed to stand." 614 F.2d at 492. Neither should this one.

The majority maintains that *Christo* does not apply here because the Regulation J violation was not mentioned in the jury instructions as the civil violation was in *Christo*. I find this unpersuasive. We noted in *Christo* that the instructions intending to limit the jury's application of the evidence of the civil violations served only to focus the jury's attention on evidence that had already "impermissibly infected the very purpose for which the trial was being conducted." *Id.* Moreover, the Ninth Circuit adopted this interpretation of *Christo* in *United States v. Wolf*, 820 F.2d 1499, 1505 (9th Cir.1987). There, they held that jury instructions describing a violation

of civil banking Regulation O as "background evidence" did not repair the damage done by the government's introduction of evidence and jury argument about the regulation violation when the government's purpose for introducing the violation was to prove the willful misapplication element. *Id.*

Here, the majority contends that the district court's admonitions regarding the § 84 violations "likely prevented" any bootstrapping of the Regulation J violations to gain the § 656 conviction. I disagree. I am confident that the jury relied on the government's evidence of the Regulation J violation to find the "intent to defraud" element required by § 656. The jury showed their confusion as to this point in a note sent during deliberations that asked: "Is there a law stating items must be posted daily in a banking institution regarding the check being returned the second time? Should it have been posted the day it was returned by law?"

As *Christo* reminds us, we must heed the Supreme Court's distinction between the misapplication of funds under § 656 and a banker's mere "maladministration" of the affairs of the bank. See *Christo*, 614 F.2d at 490 (citing *United States v. Britton*, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed. 520 (1882)). In *Britton*, the Supreme Court reversed a conviction under the predecessor to § 656, holding that maladministration of the affairs of a bank does not constitute criminal misapplication. The Court concluded that to hold otherwise would mean that "every official act of an officer, clerk or agent of a banking association, by which its funds are applied in a way not authorized by law, would be punishable" for criminal misapplication.

Cordell may have violated several civil banking regulations in his efforts to avoid civil liability under § 84. I disagree with the majority's conclusion, however, that these efforts supplied the intent and conduct necessary to convict him of felony fraud under either § 1005 or § 656. His hand was in no till; he took no money for himself and no one lost any; and he de-

serves no criminal conviction. I therefore respectfully dissent.