**UNITED STATES of America, Plaintiff,**

v.

**John William VAN DYKE, Jr., Defendant.**

**No. Cr. 92–CV–4009.**

United States District Court, N.D. Iowa, W.D.

March 1, 1993.

Lawrence F. Scalise, John R. Sandre, Des Moines, IA, for defendant.

Judith A. Whetstine, Asst. U.S. Atty., Cedar Rapids, IA, Peter J. Henning, Trial Atty., U.S. Dept. of Justice, Washington, DC, for plaintiff.

## OPINION AND ORDER

VAN GRAAFEILAND, Senior Circuit Judge, Court of Appeals for Second Circuit, Sitting by Designation.

On December 15, 1992, following a two-week trial, the jury convicted John William Van Dyke, Jr. (hereinafter "defendant") on four counts of making false statements for the purpose of influencing a federally insured bank, 18 U.S.C. § 1014, three counts of bank fraud, 18 U.S.C. § 1344, one count of making a false statement in a bank record with intent to defraud or deceive, 18 U.S.C. § 1005, and one count of mail fraud, 18 U.S.C. § 1341. Defendant now moves the court to enter a judgment of acquittal on some or all of the counts, or, in the alternative, to order a new trial with respect to all of the counts. Because the court finds no merit in either request, the motion is denied in its entirety.

The court has considered the evidence as it applies to each count and, viewing it in the light most favorable to the Government, is satisfied that the jurors, as rational fact-finders, could, as they did, find defendant guilty on all counts beyond a reasonable doubt. The court also has weighed the evidence for itself and is satisfied that in all respects the jury's verdict is supported by the great weight of the evidence. *See United States v. Rodriguez*, 812 F.2d 414, 416–17 (8th Cir.1987). Indeed, much of the Government's proof was documentary in form and was not, in fact could not, be disputed. Accordingly, a lengthy and detailed review of the testimony is not required.

## BACKGROUND

When Congress passed the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. No. 95–630, 92 Stat. 3641, it was responding in part to complaints concerning improper insider transactions. "Problem banks and insider abuses", it said, "have been virtually synonymous. Nothing appears more often on the fever charts of sick financial institutions than self-dealing ailments." H.R.Rep. No. 1383, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S.C.C.A.N. 9273, 9282.

Between 1982 and 1987 defendant was President and Chairman of the Board of Toy National Bank, a small-to-medium sized bank located in Sioux City, Iowa. A family trust, of which defendant was trustee, was a substantial Bank shareholder. Defendant, through or with other family members, also had interests in other Iowa banks located in Holstein, Galva and Alta. Toy National Bank was not a healthy bank. A report of the Comptroller of the Currency, dated October 1, 1986, which followed a May 30, 1986 examination by a Federal Deposit Insurance Corporation Examiner, criticized defendant in part for this condition, citing his failure to comply with governing statutes regarding lending limits and disclosure of financial information. The Bank's directors were instructed to take action to ensure that apparent violations were corrected and that procedures and policies were put in place to ensure future compliance. The directors attempted to do so, adopting regulations and ethical standards which imposed lending limits on the Bank's executive officers and required full disclosure of their borrowings. Most of the offenses of which defendant subsequently was convicted arose out of his maneuvers to evade these rules and regulations. The jury could find, as it did, that the defendant acted knowingly and with wrongful intent. *See United States v. Cordell*, 912 F.2d 769, 775 (5th Cir.1990).

## THE FALSE STATEMENT COUNTS, 18 U.S.C. § 1014

### The Evidence

In February of 1986, defendant, as trustee of the family trust, borrowed $82,200 from Norwest Bank in Sioux City, Iowa, for the stated purpose of purchasing stock in Toy National Bank. The actual purpose of the loan was the payment of defendant's personal overdrafts at First Trust and Savings Bank of Galva, Iowa. (Count 1).

In September of 1986, defendant borrowed $18,000 from Norwest Bank for the stated purpose of paying property taxes, when the actual purpose was the payment of a personal loan at Holstein State Bank. (Count 2).

In October of 1986, defendant borrowed $20,000 from Norwest Bank for the stated purpose of purchasing stock in Toy National Bank, when the actual purpose was the making of a payment on a trust loan at the Holstein Bank. (Count 3).

In February of 1987, defendant borrowed $100,000 from Crawford County Trust and Savings Bank of Denison, Iowa, for the stated purpose of purchasing Toy stock, when the actual purpose was the payment of overdrafts on defendant's personal account at Norwest Bank. (Count 5).

### The Charge

 Unable to mount a satisfactory challenge to the Government's proof of the above facts, defendant challenges the court's charge to the jury on the pertinent law. The court instructed the jury that in order to convict defendant of violating section 1014, the Government had to prove that defendant made a materially false statement or report to a bank knowing that it was false, and that he made the false statement or report with the intent to influence the bank's action upon his loan application. The court then instructed the jury as follows:

> In each of the four counts, an allegedly false statement was made having to do with the purpose of the loan or the loan renewal, that is, the reason for borrowing the money. I charge you that this was material information and, as such, it is governed by the provisions of section 1014. In other words, a misstatement concerning the purpose for which money is borrowed from a bank is a misstatement of a material fact.

While conceding that materiality was an issue for the court, defense counsel contend that the court misstated the law on materiality. Counsel misunderstand the law. Case after case, in the Eighth Circuit as else-

where, hold that the stated purpose of a loan is a material fact. As Judge Posner, writing for the Seventh Circuit in *United States v. Shively,* 715 F.2d 260, 264 (1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984), bluntly put it:

> There is no question that by signing a promissory note which contained a statement that he knew was false (that the purpose of the loan was "business expense and marketing operation") Pardee was making a false statement within the meaning of the statute.

*See also United States v. Segal,* 649 F.2d 599, 601 (8th Cir.1981); *United States v. Griffin,* 579 F.2d 1104, 1109 (8th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978); *Brilliant v. United States,* 297 F.2d 385, 389 (8th Cir.), *cert. denied,* 369 U.S. 871, 82 S.Ct. 1140, 8 L.Ed.2d 275 (1962); *United States v. Hockridge,* 573 F.2d 752, 755 n. 10 (2d Cir.), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 86, 58 L.Ed.2d 112 (1978); *United States v. Cleary,* 565 F.2d 43, 46 (2d Cir.1977), *cert. denied,* 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978).

Defense counsel contend that unless defendant's misstatement of purpose actually influenced the lending institutions, the misstatement could not be material. Needless to say, counsel submitted no authority to support this contention. The question is not whether defendant's misstatements actually influenced the banks; it is whether the misstatements had the capability or tendency to influence them. *See United States v. Copple,* 827 F.2d 1182, 1187 (8th Cir.1987), *cert. denied,* 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988); *United States v. Whitaker,* 848 F.2d 914, 916 (8th Cir.1988).[1]

The jury's verdicts on Counts 1, 2, 3 and 5 were based on correct instructions as to the law and were fully supported by the evidence.

---

1. Other circuits, following the Supreme Court's lead in *Kay v. United States,* 303 U.S. 1, 6, 58 S.Ct. 468, 471, 82 L.Ed. 607 (1938), are in accord. *See United States v. Sheehy,* 541 F.2d 123, 127–28 (1st Cir.1976); *United States v. Niro,* 338 F.2d 439, 440–41 & n. 2 (2d Cir.1964); *United States v. Whaley,* 786 F.2d 1229, 1232 (4th Cir. 1986); *United States v. Kindig,* 854 F.2d 703, 706 (5th Cir.1988); *United States v. McGee,* 831 F.2d 670, 671 (6th Cir.1987); *United States v. Glassey,* 715 F.2d 352, 354 (7th Cir.), *cert. dismissed,* 464 U.S. 1032, 104 S.Ct. 566, 78 L.Ed.2d 733 (1983); *United States v. Kennedy,* 564 F.2d 1329, 1340 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Haddock,* 956 F.2d 1534, 1550 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992).

## THE REMAINING COUNTS

The court began its instructions concerning Counts 4, 6, 7, 8 and 9 with the following general statement:

Now let us turn to the remaining counts in the indictment which, as I have just told you, are substantially different from Counts 1, 2, 3 and 5. That difference lies in the fact that while Counts 1, 2, 3 and 5 involve only the intent to influence, the remaining counts involve intentions to deceive or defraud. This creates the issue of whether the defendant acted in good faith in performing the acts charged against him in Counts 4, 6, 7, 8 and 9. Good faith is a complete defense to the charges contained in these counts if it is inconsistent with those charges.

The court then instructed the jury on the subject of good faith and the Government's burden of proving its absence. Following this, the court turned to the individual counts.

## THE CHECK KITING COUNT,
### 18 U.S.C. § 1344(a)(1)

The Government offered unassailable documentary evidence to establish that defendant engaged in a procedure commonly known as "check kiting." The following checks, all drawn against insufficient funds, were involved:

| Date | Drawn on Defendant's Account at | Amount | Deposited in Defendant's Account at |
|---|---|---|---|
| February 6, 1987 | Toy National Bank | $ 50,000 | Norwest Bank |
| February 9, 1987 | Norwest Bank | 51,000 | Toy National Bank |
| February 12, 1987 | Toy National Bank | 181,000 | Norwest Bank |
| February 13, 1987 | Norwest Bank | 190,000 | Toy National Bank |
| February 17, 1987 | Toy National Bank | 110,000 | Norwest Bank |

■ The court did not instruct the jury that check kiting per se is a federal offense. It charged instead that, before the jurors could find the defendant guilty of bank fraud as charged in Count 4 of the indictment, they must find that, in doing the kiting, defendant was executing or attempting to execute a scheme or artifice to defraud one or both of the banks. The court then discussed the essential elements of a scheme to defraud, including the Government's burden of negating defendant's claim of good faith. The jury was amply justified in finding that defendant was guilty of fraudulent conduct in writing the five checks knowing as he did so that each of them was drawn against insufficient funds. *See United States v. Ratchford,* 942 F.2d 702, 704 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1185, 117 L.Ed.2d 427 (1992). As explained by the court in *United States v. Howard,* 706 F.2d 267, 267–68 (8th Cir.), *cert. denied,* 464 U.S. 934, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983), "if the money to cover the check is not in [the drawee] bank to begin with there is a risk that the credit will never become final."

The total manufactured credit in the instant case approximated one-half million dollars, divided between the two banks. The alleged offer of Michael Moeller, a Norwest Bank officer, to loan defendant money if his first check from Toy to Norwest was dishonored did not excuse the fraud and deceit inherent in the deposit of the checks, particularly those delivered to Toy. Bank officials at Toy were unanimous in their criticism of defendant's kiting, stating that Moeller had no right to speak for Toy and that defendant's conduct exposed Toy to unnecessary risk and expense. Finally, it is quite apparent that defendant's testimony that he was expecting to receive a check for $100,000 from a third bank carried little weight with the jury in the face of proof that three of the kited checks were for amounts substantially in excess of $100,000.

## THE FALSE ENTRIES COUNT,
### 18 U.S.C. § 1005

■ In pertinent part, 18 U.S.C. § 1005 forbids the making of "any false entry in any

book, report, or statement of [any Federal Reserve bank, member bank, national bank, or insured bank] with intent ·... to deceive any officer of such bank ... or·any agent or examiner appointed to examine the affairs of such bank.,..."

The Government charged in Count 6 that, "with intent to deceive OCC and FDIC bank examiners and the officers of The Toy National Bank" defendant borrowed $80,000 from Toy using one Fred Hagen as a dummy borrower; that defendant accomplished ·this by arranging a $125,000 letter of credit for Hagen and then having Hagen draw down $80,000 against this credit and loan it to him. The true nature of this transaction is summarized succinctly in the following excerpt from a letter sent by Hagen to defendant on October 31, 1987:

> We, also, have $80,000.00 that you borrowed from the Toy National Bank with my approval, last February. This note has just been renewed. What I am wondering is—when am I going to get paid on this transaction?

Defendant, who personally was indebted to Toy in the sum of $92,000, both prepared and approved Hagen's application for the $125,-000 letter of credit. In response to the question "Purposes", defendant wrote "INVEST-MENT", and he now contends that Hagen's loan to him constituted an "INVESTMENT." This argument lacks plausibility. The interest charged on Hagen's draw was 7½ percent. The interest that defendant agreed to pay Hagen was 10½ percent. A reasonable juror might well wonder why a businessman like Hagen would incur an indebtedness of $83,-000 ($80,000 plus six months' interest) in order to make an investment with a "profit" limited to $1,200. The same juror might also wonder why defendant would pay the 3 percent premium representing the difference between the bank loan and Hagen's loan if he was not trying to hide the borrowing from the Bank. In any event, whatever terminology defendant might have used in Hagen's application, insofar as defendant was concerned, the $80,000 transaction was purely and simply a loan, repayable at a stated time with a stated rate of interest.

The court left it ·to the jury, however, to decide whether the Bank's $80,000 loan to Hagen was "in reality a disguised loan to the defendant" and, if so, "whether the defendant's failure to disclose it was done with the intent to deceive bank officers or examiners" so as to constitute a violation of 18 U.S.C. § 1005. The jury quite properly decided that it was. *See United States v. Walker,* 871 F.2d 1298, 1307 (6th Cir.1989):

> Where a bank officer arranges loans for a named borrower, intending that the proceeds will benefit himself, and without disclosing his interest in the loan transaction, he has acted in a deceitful and dishonest manner.

■ Human frailties being what they are, undisclosed transactions of this type are not rare. *See, e.g., United States v. Austin,* 823 F.2d 257, 258–60 (8th Cir.1987), *cert. denied,* 484 U.S. 1044, 108 S.Ct. 778, 98 L.Ed.2d 864 (1988); *United States v. Krepps,* 605 F.2d 101, 108–09 (3d Cir.1979). As these cases illustrate, an entry may be false for purposes of section 1005 by virtue of an omission of material information as much as by an actual misstatement. *See, e.g., United States v. Krepps, supra,* 605 F.2d at 109. *See also United States v. Cordell, supra,* 912 F.2d at 774; *United States v. Chandler,* 910 F.2d 521, 523 (8th Cir.1990). Moreover, even authorization or consent by the bank would not be a defense if the offender intended to deceive bank examiners. *United States v. Stokes,* 471 F.2d 1318, 1321 (5th Cir.1973); *United States v. Klock,* 210 F.2d 215, 216 (2d Cir.), *cert. denied,* 347 U.S. 960, 74 S.Ct. 710, 98 L.Ed. 1104 (1954).

Defendant's conviction on Count 6 clearly was proper.

## THE UNAUTHORIZED ALTA LOAN COUNT, 18 U.S.C. § 1344

■ Count 7 of the indictment charged defendant with violating both subdivision (1) of section 1344 (scheme or artifice to defraud) and subdivision (2) (obtaining money by false pretenses). The Government's proof on this count was straightforward and uncontradicted.

First Trust and Savings Bank of Alta maintained a correspondent account at Toy Bank. Defendant's account at Alta shows that as of April 15, 1987 there were three outstanding loans to defendant represented by two $15,000 notes dated October 17, 1986 and March 25, 1987 respectively and one $10,000 note dated April 10, 1987. The first and second loans were made with the knowledge and consent of the Alta Board of Directors; the third, although ostensibly made with approval, in fact was not. A summary of defendant's deceptive use of the correspondent account is contained in the records of the Alta Bank. On April 15, the President of the Alta Bank wrote defendant the following letter:

> At this time you have three loans at the Alta Bank totalling $40,000.00 which is $15,000.00 over the limit the State of Iowa Banking Department has stated we can legally carry. One of the loans for $15,-000.00 is due April 17, 1987. If you would pay that by Monday, April 20th plus the interest of $912.35 it would get us out of any problems that may cause with the regulators, etc.
>
> Another problem that is difficult to explain to them is when our account is debited at the Toy National Bank without our prior knowledge as was the case with this loan. Was there somebody at the Toy that was supposed to call us on this ahead of time? I did get a call from you on that earlier $15,000.00 loan of 3/25/87, but not on this one.

The April 10 loan was not approved by the Alta Board. The reason for this is contained in the minutes of the Alta Board of Directors' May 13, 1987 meeting:

> This loan was not approved because it exceeded the legal lending limit for an Officer of this Bank and the making of the loan was not made in the proper manner. This loan was completed by John Van Dyke, himself, at the Toy National Bank, sent to us through our regular mailing along with a debit to our account at the Toy National Bank. A letter has been

sent to John Van Dyke requesting that this situation be corrected, and that a loan that is now mature in the amount of $15,-000 be paid off.[2]

The Alta Board understandably was concerned because, in addition to exposing the Alta Bank to the risks of nonpayment inherent in any unapproved loan, defendant's borrowing over the legal limit exposed both the Bank and its officers to possible substantial penalties. *See Sunshine State Bank v. FDIC,* 783 F.2d 1580 (11th Cir.1986); *Groos Nat. Bank v. Comptroller of the Currency,* 573 F.2d 889 (5th Cir.1978); 12 U.S.C. §§ 375(a), 1817 and 1818. Had the Alta Bank been aware of what defendant was doing, they surely would have disapproved of it.

Defendant did not contradict any of the above-quoted summaries of his activities. His only defense, as stated in his counsel's motion now under consideration, is that "presumably someone from the Toy Bank failed to call the Alta Bank to tell them the documentation was coming." To the extent that this lame excuse could be interpolated from defendant's ambiguous testimony at the trial, it obviously received short shrift from the jury.

### THE BANK FRAUD AND MAIL FRAUD COUNTS 18 U.S.C. § 1344, 1341, and 2(b)

Counts 8 and 9 are based on the same bank loss and therefore will be discussed together. As above stated, on February 14, 1986, defendant, as trustee of the family trust, borrowed $82,200 from Norwest Bank for the stated purpose of buying Toy National Bank stock. On the same day, Toy, as trustee of the Toy National Bank Pension Trust, delivered to defendant certificate number 1817 representing 208 shares of Toy stock. Instead of using the proceeds of the Norwest Bank loan to buy the 208 shares, defendant used the money to pay overdrafts on his personal checking account at First Trust and Savings Bank of Galva and returned the certificate for 208 shares to Toy.

---

**2.** A subsequent Board entry stated that the Bank had written three letters to defendant without

receiving any reply.

These facts, established by both bank records and the testimony of bank officials, are uncontradicted.

Three years later, after Toy had gone into liquidation and defendant had been declared a bankrupt, Dean Meine, defendant's successor as trustee of the family trust, and Earl Geiger, defendant's successor as President of Toy National Bank, were led by defendant to believe that defendant had paid Toy $82,200 when the certificate for 208 shares was issued and that this amount was not repaid when the stock was returned. Based on this misinformation, Meine threatened suit if the money allegedly owed was not paid. Negotiations ensued and culminated in an agreement which, among other things, required Toy to pay $82,200 to the family trust. Defendant was a party to this agreement, which he must have known was based on a misunderstanding of the facts. The Government prosecuted the fraud thus consummated in separate counts.

In Count 8, the Government charged that defendant represented and caused the family trust to represent that the family trust had purchased and paid for the 208 shares of stock and that the purchase price had not been repaid when the shares were returned to the Bank, 18 U.S.C. § 1344. In Count 9, the Government added an additional allegation to the effect that the fraud was accomplished with the use of the mails, 18 U.S.C. § 1341. Both counts also alleged violations of 18 U.S.C. § 2(b), the aiding and abetting statute. The careful consideration that the jury gave these two counts before finding defendant guilty was manifested by their request that Dean Meine's testimony be re-read. Because the misunderstanding concerning the asserted payment and non-repayment of the $82,200 could have originated with and been fostered only by defendant, it is not at all surprising that the jury found him fraudulently responsible for the Bank's loss. Indeed, it would have been surprising if the jury had found otherwise. Conviction on both counts must stand.

■ Defense counsel's blunderbuss allegations of procedural error require little comment. There was no prejudicial error in the admission of evidence. The burden was on the Government to prove that defendant acted knowingly and willfully and not in good faith. To meet this burden, the Government offered evidence to show what motivated defendant to act as he did. This consisted in part of proof that defendant had thousands of dollars in short term notes and overdrafts at the various banks mentioned herein, which presented him with recurring cash flow problems. As a result, he constantly borrowed from Peter to pay Paul, without telling Peter what he was doing. Moreover, he was told by bank officials and examiners that what he was doing was wrong. The court repeatedly admonished the jury, throughout the trial and in its charge, that this evidence was admitted solely on the issue of knowledge, motive and intent.

■ The Eighth Circuit treats Fed. R.Evid. 404(b) as a rule of inclusion, permitting evidence of other wrongful acts which are relevant to an issue in the trial unless the evidence tends only to prove the defendant's criminal disposition or character. *United States v. Dobynes*, 905 F.2d 1192, 1195 (8th Cir.), *cert. denied*, 498 U.S. 877, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); *United States v. Krapp*, 815 F.2d 1183, 1188 (8th Cir.), *cert. denied*, 484 U.S. 860, 108 S.Ct. 174, 98 L.Ed.2d 127 (1987). The evidence complained of herein was clearly relevant and proper. *See United States v. Mallen*, 843 F.2d 1096, 1099–1100 (8th Cir.), *cert. denied*, 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988).

■ The court's limited and unobjected-to participation in the trial did not constitute prejudicial error. At the outset of the trial, the court charged the jury:

> Nothing the court may say or do during the course of the trial is intended to indicate nor should be taken by you as indicating what your verdict should be.

The court repeated this admonition in its final charge:

> Nothing I have said or done is intended to suggest what your verdict should be— that is entirely for you to decide.

■ The court was not required to be simply a moderator. It had the active duty

to see that the trial was fairly conducted and the issues clearly presented, *United States v. Archie,* 656 F.2d 1253, 1259 (8th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982), *United States v. Nelson,* 570 F.2d 258, 262 (8th Cir.1978), "to make the interrogation of witnesses and presentation of evidence effective for the ascertainment of the truth," *United States v. Cooper,* 596 F.2d 327, 330 (8th Cir.1979). In the performance of this duty, a court "may examine any witness to bring out needed facts which have not been elicited by the parties." *United States v. Harris,* 488 F.2d 867, 868 (8th Cir.1973) (quoting C. McCormick, *McCormick on Evidence* § 8 at 12 (Cleary ed. 1972)); *see also Scruggs v. United States,* 450 F.2d 359, 361–63 (8th Cir.1971), *cert. denied,* 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972); Fed.R.Evid. 614(b).

 The court instructed the jury in its charge that if it believed that a copy of the indictment would be of assistance in its deliberations the jury might request it. The jury did request it, and, over defense objections, a copy was sent to the jury room. At the court's suggestion, and with the approval of defense counsel, the copy was accompanied by the following written instruction:

> As requested by you, I have sent in the indictment. I remind you again, however, that it is only an accusation, and proves nothing.

There was no error here. *See United States v. Hartness,* 845 F.2d 158, 162 (8th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 326 (1988); *United States v. Wagoner,* 713 F.2d 1371, 1377–78 (8th Cir.1983).

 The court likewise did not abuse its discretion in acceding to the jury's request that it be given copies of the statutes, the violations of which were charged in the indictment. *See United States v. Chavis,* 772 F.2d 100, 109–10 (5th Cir.1985); *United States v. Polizzi,* 500 F.2d 856, 875–76 (9th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 803, 42 L.Ed.2d 820 (1975).

 The court also instructed the jury that, if it wanted part of the testimony read to it, the court would comply with the request. As above stated, the jury requested that the testimony of Dean Meine be read. This request was granted, again over the objection of defense counsel. The court did not abuse its discretion in following this well-recognized practice. *See United States v. Bear Ribs,* 722 F.2d 420, 423 (8th Cir.1983); *Stone v. United States,* 506 F.2d 561, 564 (8th Cir.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *Gregory v. United States,* 365 F.2d 203, 206 (8th Cir. 1966), *cert. denied,* 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676 (1967).

 The court attempted throughout the trial to ensure that the jury was fully informed as to the issues, the facts and the law. It also instructed the jury that if there was anything about its instructions that was not clear, or if the jury didn't remember or didn't understand something the court may have said or wanted the court to say it over again, it need only send the court a note and the court would do its best to comply. Under the circumstances, the court did not abuse its discretion in failing to provide the jury with a written copy of its entire instructions. *United States v. Engleman,* 648 F.2d 473, 480 (8th Cir.1981); *United States v. Conley,* 503 F.2d 520, 522 (8th Cir.1974).

## CONCLUSION

The evidence of defendant's guilt was so substantial as to merit in some instances the description of "overwhelming." While the court is not so presumptuous as to assert that defendant had a perfect trial, he had a fair trial. *See Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953); *United States v. Bentley,* 706 F.2d 1498, 1511 (8th Cir.), *cert. denied,* 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983). The defense motion is in all respects denied.